[Cite as *Northpoint Properties, Inc. v. Charter One Bank*, 2014-Ohio-1430.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 100210

---

# NORTHPOINT PROPERTIES, INC.

### PLAINTIFF-APPELLEE

### vs.

# CHARTER ONE BANK., F.S.B., ET AL.

### DEFENDANTS-APPELLANTS

---

### JUDGMENT:
### AFFIRMED IN PART, REVERSED IN PART
### AND REMANDED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case Nos. CV-03-494961 and CV-06-589150

**BEFORE:**   Jones, P.J., McCormack, J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:**   April 3, 2014

**ATTORNEYS FOR APPELLANTS**

Diane E. Citrino
Marquettes D. Robinson
Ryan J. Sears
Mark I. Wallach
Thacker Martinsek L.P.A.
2330 One Cleveland Center
1375 East 9th Street
Cleveland, Ohio 44114


**ATTORNEYS FOR APPELLEE**

Richard C. Haber
Haber Polk Kabat L.L.P
737 Bolivar Road
Suite 4400
Cleveland, Ohio 44115

Patrick J. Holland
Cindy L. Renner
c/o Northpoint Properties, Inc.
75 Public Square
Suite 300
Cleveland Ohio 44113

Edward R. LaRue
75 Public Square
Suite 800
Cleveland, Ohio 44113

Angelo F. Lonardo
Yelsky & Lonardo
75 Public Square
Suite 800
Cleveland, Ohio 44113

LARRY A. JONES, SR., P.J.:

**{¶1}** Defendants-appellants, Charter One Bank, F.S.B., and Thriftco, Inc. (hereinafter referred to individually as "Charter One" or "Thriftco" or collectively as "appellants"), appeal multiple orders from the trial court issued after remand from this court. After thorough review and consideration, we affirm in part, reverse in part, and remand.

## BACKGROUND FACTS[1]

**{¶2}** In 1997, plaintiff-appellant, Northpoint Properties, Inc., purchased a 15-story office building located at 75 Public Square in Cleveland from Thriftco, a wholly owned subsidiary of Charter One. Northpoint claimed that when purchasing the building, it justifiably relied upon fraudulent representations about, and the concealment of, the condition of the building's fire-suppression system and domestic water lines.

**{¶3}** In January 1996, Charter One took possession of the building through a deed in lieu of foreclosure. Shortly thereafter, Charter One hired Kaczmar Architects, Inc., and Pyramid Electric, Inc. to inspect the property. The Kaczmar-Pyramid report ("Kaczmar Report") recommended that a fire-protection expert be retained to "recommend changes to the sprinkler, standpipe, fire hose cabinet and fire pump system." Despite this recommendation, no action was taken.

**{¶4}** A Phase One Environmental Site Assessment performed in February 1996

---

[1]Portions of these facts are taken from the background facts set forth in this court's en banc decision in *Northpoint Properties v. Charter One Bank*, 8th Dist. Cuyahoga No. 94020, 2011-Ohio-2512, ¶ 3-16.

indicated that there were not any serious code or regulatory violations and that "[t]he water for this property is provided by a regional public water system, and is considered safe for human consumption." A Phase One Environmental Site Assessment performed in 1997, four months before Northpoint purchased the building, also concluded that there were no code or regulatory violations and the water was safe for human consumption.

{¶5} Charter One retained Ehle Morrison Group, Ltd. ("EMG") for the management, leasing, and sale of the building. Frank Schwartz was hired as the building manager.

{¶6} Schwartz received regular complaints from tenants about the taste of the drinking water; he personally tasted the water and found it "unpleasant." During an inspection in 1996, a Cleveland fire department inspector informed Schwartz that the six-inch fire standpipe was cut and capped, a fire pump was missing, the domestic water line had been tied together with the fire-suppression system, and the water gauge on the 15th floor showed that the pressure was insufficient to run the sprinklers on that floor. Schwartz testified that he was concerned that these things might result in the actual shutting down of the building or even perhaps the loss of his job. The next time he saw EMG's owner, Bruce Morrison, Schwartz "excitedly" relayed what the inspector had told him. Morrison told him to "calm down, that everything would be okay."

{¶7} On May 1, 1996, Charter One transferred title to the building to Thriftco. Brandstetter Carroll Zolfcin, Inc., an architectural and engineering firm, was hired to inspect the building in June and November 1997. The firm also issued a report, the

"Brandstetter Report," which stated in part:

> There are presently no standpipes in the stairwells which does not comply with today's code requirements for a high rise building. The fifteenth floor is sprinklered from the domestic water system with booster pumps in the basement. There are fire hoses located throughout the building. For these to be effective, the water pressure should be verified. It is questionable whether the fire department would want these to remain in service.

{¶8} When the owner of Northpoint, Daniel Dzina, expressed interest in purchasing the building, he received a Property Interest Packet that contained both Phase One Environmental Site Assessments and the Brandstetter Report. Dzina was never given the Kaczmar Report. The paperwork EMG provided Dzina specified that the building was being sold in its "as is, where as" condition, contained disclaimers regarding representations and warranties, and indicated that buyers could only rely on their own inspections and investigations of the property.

{¶9} Northpoint did not obtain an independent property inspection before purchasing the building; Dzina testified that he relied on the reports that had been included in the Property Interest Packet, including the Environmental Site Assessment, which was completed four months prior to his purchase. Dzina, an experienced real estate purchaser, went on two tours of the building and testified he did not observe any defects in the fire-suppression or domestic water systems.

{¶10} Dzina testified that he was aware of the recommendation in the Brandstetter

Report that in order for the fire hoses to be effective, the water pressure should be verified. Instead of going through the time-consuming process of having the fire hoses tested, Northpoint replaced them after acquiring the building, operating on the assumption that they rot so it is customary to replace them instead of test them. Dzina also upgraded other fire safety measures, including the building's sprinkler system, fire extinguishers, and smoke detectors.

{¶11} Dzina claimed that *had* he received the Kaczmar Report and its recommendation that the services of a fire-protection expert be obtained "to recommend changes to the sprinkler, standpipe, fire hose cabinet and fire pump system," he would have hired such an expert to determine what needed to be done and then negotiated a lower price on the building or walked away from the sale.

{¶12} The building was appraised at $3.1 million and Northpoint bought the building in its "as is" condition for $3.15 million. The purchase agreement specifically disclaimed any representation as to the nature and condition of the property.

{¶13} Northpoint took possession of the building in January 1998 and Schwartz remained as the building manager. Four months later, after a tenant had complained to Dzina about the taste of the drinking water, he questioned Schwartz about the water. Schwartz told Dzina about the domestic and fire water tie-ins. Dzina also discovered that the fire-suppression system was not working properly when he went through the building with a fire inspector. Dzina testified that the fire inspector appeared "surprised" and "upset" that the problems the inspector had found during his previous inspection (before

Northpoint bought the building) had not been remedied.

{¶14} Northpoint hired Tri-S Piping, owned by Joe Stojkov, to inspect the fire-suppression and water line systems. Stojkov discovered a missing check valve in a main water pipe, which was necessary to prevent the backflow and mixing of water; the six-inch water-supply line was disconnected and had no pressure; and a missing fire pump. He also discovered that the pressure gauge on the 15th floor had been "pegged" to read a fixed pressure, i.e., it falsely showed that there was adequate pressure for the fire-suppression system to work on the 15th floor.

{¶15} Stojkov testified that the existing three-inch water line was insufficient to provide the volume of water needed for the fire-suppression system and he could tell from the odor of the building's drinking water that it was contaminated. Stojkov testified he could have identified all of these conditions, except the missing check valve that was located inside of a water pipe, had he inspected the building prior to Northpoint's purchase of the property.

{¶16} Northpoint initially claimed it spent $280,000 to repair the water lines and fire-suppression system and for the purchase of a fire pump.

**INITIAL TRIAL COURT RULING**

{¶17} In 2003, Northpoint filed suit against Charter One, Thriftco, and EMG, (hereinafter collectively referred to as "defendants") raising claims for fraud and breach of contract. Northpoint filed a separate action against Charter One, Thriftco, EMG, and EMG's owner, Morrison, for spoliation of evidence. The cases were consolidated.

**{¶18}** The trial court granted summary judgment in favor of the defendants on the breach of contract claim. The case proceeded to a bench trial on the fraud and spoliation claims; the trial court entered judgment for the defendants on the spoliation claim.

**{¶19}** The trial court found that Northpoint failed to prove the defendants engaged in fraud with respect to non-latent defects with the fire-suppression system because the property was being sold in its "as is" condition: Dzina had observed the capped six-inch water supply line and knew of the tie-in, Stojkov testified he could have discovered most of the defects had he inspected the property prior to purchase, and there was no evidence that the defendants concealed the absence of a fire pump.

**{¶20}** The trial court further found that the Kaczmar Report recommended only that a fire protection expert be retained to recommend changes, but the report did not point to any defects or code violations. Thus, the court determined, the defendants did not knowingly make false representations about the fire- suppression system.

**{¶21}** The trial court determined the defendants did not intend to induce reliance nor did Northpoint justifiably rely on the defendants' representations as disclaimers were made and Northpoint failed to inquire further or obtain an independent inspection of the property. Finally, the court found Northpoint failed to provide sufficient evidence of its resulting injury.

**{¶22}** The trial court did find that Northpoint established fraud with respect to latent defects in connection with the building's drinking-water system. Despite finding fraud had occurred in this regard, the trial court determined that Northpoint failed to

demonstrate injury and was therefore not entitled to damages. The court reasoned that although Northpoint presented evidence of its cost to repair the water lines and fire-suppression system, it did not present evidence of the diminution in value of the building. The trial court concluded that the "cost of repair" was not the appropriate measure of damages.

*NORTHPOINT I*

{¶23} Northpoint filed an appeal and the defendants cross-appealed. Northpoint argued that the trial court erred in finding that the applicable measure of damages was "loss in value" instead of "cost to repair." A panel of this court initially determined that the reasonable cost to repair was the appropriate measure of damages and the trial court erred in concluding that Northpoint failed to present evidence on the cost to repair the water lines and fire-suppression system. *Northpoint Properties v. Charter One Bank*, 8th Dist. Cuyahoga No. 94020, 2011-Ohio-68, ¶ 32-33.

{¶24} This court then determined that a conflict existed between *Northpoint*, 2011-Ohio-68, and this court's prior decision in *Krantz v. Schwartz*, 78 Ohio App.3d 759, 605 N.E.2d 1321 (8th Dist.1992). This court granted en banc consideration and convened an en banc conference on the question of "whether a plaintiff alleging fraud in a commercial real estate transaction is limited to recovery of the difference between the value of the property as represented and the value as actually delivered." *Northpoint Properties v. Charter One Bank*, 8th Dist. Cuyahoga No. 94020, 2011-Ohio-2512, ¶ 1 ("*Northpoint I*"). This court vacated *Northpoint*, 2011-Ohio-68, and issued *Northpoint I*

as the final decision in the appeal.

{¶25} This court answered the certified question in the negative and determined that the correct measure of damages was the cost of repair. In this case, "[b]ecause market value may not have been affected by the faulty systems, it is likely that the diminution-in-value measure of damages would not adequately compensate Northpoint and would effectively allow the defrauding party to escape liability." *Northpoint I* at ¶ 36. Therefore, "[t]he appropriate inquiry is whether competent evidence of damages has been presented to establish with reasonable certainty an amount sufficient to fully and fairly compensate the aggrieved party." *Id.*

{¶26} This court considered that Northpoint purchased the property with defective fire-suppression and contaminated drinking water systems, which formed the basis for the company's fraud claims. Northpoint repaired the defects due to health and safety concerns and presented evidence of the cost to repair the premises to conform with the defendants' original representations of the condition of the property.

{¶27} This court also determined that the trial court erred in concluding that Northpoint failed to present evidence on the appropriate measure of damages. The case was remanded for the trial court to determine the cost to repair. The trial court was instructed that it was within its discretion to "make this determination upon the evidence presented, or to accept additional briefing or evidence regarding damages." *Id.* at ¶ 70.

{¶28} Within its appeal, Northpoint had also argued that the trial court committed reversible error in allowing the unilateral withdrawal of the defendants' jury demands and

in striking Northpoint's jury demands. This court disagreed, concluding the trial court did not err by enforcing the contractual waiver contained in the parties' sales agreement and ordering the matter to proceed to a non-jury trial. *Id.* at ¶ 44.

{¶29} Northpoint also claimed that the trial court erred in refusing to pierce the corporate veil of Charter One and refusing to award punitive damages to Northpoint.[2] This court overruled this argument, but recognized that those issues that had not yet been determined by the trial court and would be upon remand. *Id.* at ¶ 48.

{¶30} Finally, this court considered the defendants' issue raised on cross-appeal, whether the trial court erred in finding that Northpoint proved liability for fraud as to the latent defects with the drinking water system, even though the trial court found no evidence of cognizable damages. This court determined that the relevant inquiry was whether the defects would have been discovered by an ordinarily prudent purchaser who had a duty to use diligence in inspecting the property before purchase. *Id.* at ¶ 54. Employing that inquiry, this court concluded that the trial court erred in its finding as to the non-latent nature of the defects because the defects found by Northpoint's expert would not be discoverable by an ordinarily prudent purchaser.

{¶31} This court concluded that the trial court's finding that Northpoint failed to prove fraud with regard to the fire-suppression system was against the manifest weight of the evidence because the trial court record clearly established fraud with respect to the

---

[2] Northpoint also argued that the trial court erred in "limiting its analysis and findings to EMG" but this court noted that the trial court extended its ruling to Charter One and Thriftco.

defective condition of both the domestic water lines and the fire-suppression system. *Id.* at ¶ 67. Moreover, neither the doctrine of caveat emptor nor the defense of spoliation barred Northpoint's fraud claim.

**CASE ON REMAND**

{¶32} After the case was remanded to the trial court, Northpoint moved for a status conference. The court denied the request and ordered the parties to brief any remaining issues. Northpoint filed its post-remand brief and attached four affidavits to support an additional compensatory damages claim of $83,272 that it alleged it spent on labor costs associated with the cost to repair.

{¶33} In response, the defendants moved to strike the affidavits and asked for leave to reopen discovery; the trial court denied their request. The trial court indicated in a journal entry dated December 14, 2011, " [w]hile not stricken from the Record, the Court will not consider new evidence when rendering its decision upon remand."

{¶34} A year later, on December 21, 2012, the trial court issued its written opinion, holding: (1) Thriftco was the alter ego of Charter One, therefore Charter One could be held liable for Thriftco's actions; (2) the defendants were jointly and severally liable to Northpoint for damages that flowed from their fraudulent conduct, measured by the reasonable cost of repair, and liable for court costs; and (3) the defendants were jointly and severally liable for punitive damages in the amount of $3,269,448, plus attorney fees.

{¶35} The trial court determined Northpoint provided sufficient evidence of additional compensatory damages in the amount of $83,272, for a total cost of repair of

$363,272. The trial court also found that Northpoint was entitled to an award of punitive damages based on the defendants' conscious disregard for the rights and safety of others. The court found that the defendants knowingly jeopardized the health and safety of the users and occupants of the building by subjecting them to a contaminated water supply and faulty fire-suppression system. Further, with knowledge of the defects on the property, the defendants concealed said defects and materially misrepresented the condition of the property; therefore, Northpoint was entitled to punitive damages in the amount of $3,269,448.

{¶36} The trial court ordered the parties to brief the issue of attorney fees and whether prejudgment interest was due and owing and set the matter for hearing. The trial court subsequently held a lengthy hearing at which it took testimony and the parties submitted exhibits.

{¶37} The court awarded attorney fees and prejudgment interest to Northpoint. The trial court found that Northpoint's original calculation of $1,282,188.39 in attorney fees was excessive and reduced the award to $751,228.39. The court also granted Northpoint's request for prejudgment interest on compensatory damages in the amount of $201,690.60, finding that the defendants failed to make a good faith effort to settle the case and the plaintiff did not fail to make a good faith effort to settle the case.

**ASSIGNMENTS OF ERROR**

{¶38} Charter One and Thriftco filed a timely notice of appeal. EMG did not file a notice of appeal and, therefore, it is not a party to this appeal.

I. The Trial Court denied Charter One and Thriftco due process of law and their rights under the Ohio Rules of Civil Procedure and the Ohio Rules of Evidence by increasing Northpoint's compensatory damages from $280,000 to $363,272.

II. The Trial Court erred in piercing the corporate veil of Thriftco.

III. The Trial Court erred in awarding Plaintiff punitive damages against Charter One and Thriftco.

IV. The Trial Court erred in failing to apply the cap on punitive damages contained in Ohio Revised Code Section 2315.21(D)(2)(a).

V. The award of punitive damages by the Trial Court violated Charter One's and Thriftco's rights to due process of law.

VI. The Trial Court's award of attorney's fees to Northpoint was based on the improper award of punitive damages, and should therefore be reversed.

VII. The Trial Court's award of prejudgment interest to Northpoint constituted an abuse of discretion.

## COMPENSATORY DAMAGES

{¶39} In the first assignment of error, the appellants argue that the trial court erred when it increased the amount of compensatory damages from $280,000 to $363,272. Again, the additional $83,272 was based on the payments Northpoint alleged it made to its employees who assisted Tri-S Piping in repairing the water lines. To support the additional amount, Northpoint attached four affidavits and exhibits to each affidavit in its post-remand merit brief. The defendants moved to strike the affidavits and exhibits, which the trial court denied.

{¶40} The appellants contend that the trial court's decision to consider the affidavits and accompanying exhibits to increase the amount of compensatory damages

was an abuse of its discretion. The appellants further argue that the affidavits constituted inadmissible hearsay and that the trial court erred in denying them the opportunity to conduct discovery on the new evidence found in the affidavits and exhibits.

{¶41} The four affidavits consisted of averments from Northpoint's owner Daniel Dzina, Tri-S Piping's owner Joe Stojkov, and two Northpoint employees. Each affidavit was accompanied by what appear to be identical sets of approximately 80 pages of photocopied documents, consisting of: (1) a five-page undated spreadsheet captioned "Tri-S Piping Invoice correlating to NorthPoint payroll for specific time periods in the years 1999, 2000 and 2001," which summarized payments made to Northpoint employees Matthew Ging, William Montgomery, Leon Williams, and Charles Harmotta; (2) cancelled paychecks made payable to the same four employees; (3) labor invoices from Tri-S Piping; and (4) checks from Northpoint made payable to Tri-S Piping.

{¶42} In his affidavit, Stojkov confirmed that he received the help of Northpoint employees and the cost of repairs would have exceeded $400,000 if he had not received their assistance. Northpoint employees Matthew Ging and William Montgomery averred that they had reviewed the documents, the documents reflected the hours they worked for Tri-S Piping, and the documents were a true and accurate reflection of payments they received. Dzina averred that he was president of Northpoint and that he provided his employees as helpers to Tri-S, and the documents reflected the hours his employees worked for Tri-S. He stated that the attached documents were a true and accurate reflection of the labor expenses Northpoint incurred to assist in fixing the water pipes.

**{¶43}** Northpoint claims that the documents attached to the affidavits were business records, and are therefore excepted from the hearsay rules by Evid.R. 803(6). It also relies on this court's language in *Northpoint I* that stated that the trial court could consider additional evidence when determining the cost to repair. Therefore, according to Northpoint, the trial court was within its authority to consider the affidavits and accompanying documents when calculating the compensatory damages award.

**{¶44}** Evid.R. 803(6) governs the admission of business records:

> To qualify for admission under Rule 803(6), a business record must manifest four essential elements: (i) the record must be one regularly recorded in a regularly conducted activity; (ii) it must have been entered by a person with knowledge of the act, event or condition; (iii) it must have been recorded at or near the time of the transaction; and (iv) a foundation must be laid by the "custodian" of the record or by some "other qualified witness."

*State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 171, citing Weissenberger, *Ohio Evidence Treatise 600*, Section 803.73 (2007). But a trial court abuses its discretion when it admits a business record in the absence of an adequate foundation to establish admissibility under Evid.R. 803(6). *State v. Myers*, 153 Ohio App.3d 547, 2003-Ohio-4135, 795 N.E.2d 77, ¶ 58 (10th Dist.).

**{¶45}** This situation is unique because the trial court awarded damages based on affidavits and evidence that were neither part of a Civ.R. 56(C) motion for summary judgment nor admitted at trial. However, if the trial court was going to award additional

damages based on sworn evidence, the evidence must meet basic rules of admissibility. And although Dzina could attest to his personal knowledge of the attached evidence, neither he nor the other affiants attested that the records were kept in the regular course of business as required by Evid.R. 803(6)(i). Moreover, the five page spreadsheet that summarizes payments made to Northpoint employees was clearly not made in course of regular business activity. As such, the affidavits contained inadmissible hearsay, and the trial court erred in considering them.

{¶46} We find no merit in Northpoint's argument that the appellants should have deposed the affiants if they wanted to challenge their affidavits or the amount of additional damages. The trial court denied appellants' motion to strike, motion to reopen discovery, and stated that it would not consider any "new evidence" in calculating compensatory damages. Therefore, there was no reason for appellants to further challenge Northpoint's assessment of compensatory damages.

{¶47} In light of the above, the trial court erred when it increased compensatory damages to $363,272. Therefore, we remand the case for the trial court to enter judgment in favor of Northpoint and against the defendants, jointly and severally, in the amount of $280,000 for compensatory damages.

{¶48} The first assignment of error is sustained.

**PIERCING THE CORPORATE VEIL**

{¶49} In the second assignment of error, the appellants argue that the trial court erred by piercing the corporate veil to impose liability on Charter One through finding that

Charter One operated Thriftco as an alter ego and sham corporation.

{¶50} In civil cases, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus. Moreover, the credibility of witnesses and resolutions of conflicts in evidence are matters for the trier of facts. *G. F. Business Equip., Inc. v. Liston*, 7 Ohio App.3d 223, 225-226, 454 N.E.2d 1358 (10th Dist.1982). Therefore, a reviewing court should not reverse a trial court's decision if it merely has a difference of opinion on questions of credibility or the weight of the evidence; rather, a trial court's decision should be overturned only when there is no competent and credible evidence to support that decision. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984); *see also Hayes v. Walt Ward Constr. Co.*, 8th Dist. Cuyahoga No. 69557, 1996 Ohio App. LEXIS 5199, *23 - *24 (Nov. 21, 1996) (employing a civil manifest weight standard of review when reviewing a piercing the corporate veil claim).

{¶51} In order to pierce the corporate veil and hold Charter One liable for the acts of Thriftco, there must be evidence establishing: (1) Charter One controlled Thriftco so completely that Thriftco had no separate mind, will, or existence of its own, (2) control over Thriftco was exercised in such a manner as to commit fraud, an illegal act, or a similarly unlawful act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong. *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos.*, 67 Ohio St.3d 274, 617 N.E.2d

1075 (1993), paragraph three of the syllabus, and *Dombroski v. WellPoint, Inc.*, 119 Ohio St.3d 506, 2008-Ohio-4827, 895 N.E.2d 538, syllabus.

**{¶52}** Thus, under the first *Belvedere* prong, Northpoint must show that Thriftco and Charter One were fundamentally indistinguishable. *Belvedere* at 288. In making this determination, a trial court may consider such factors as:

> (1) grossly inadequate capitalization, (2) failure to observe corporate formalities, (3) insolvency of the debtor corporation at the time the debt is incurred, (4) shareholders holding themselves out as personally liable for certain corporate obligations, (5) diversion of funds or other property of the company property for personal use, (6) absence of corporate records, and (7) the fact that the corporation was a mere facade for the operations of the dominant shareholder(s).

*Sanderson Farms, Inc. v. Gasbarro*, 10th Dist. Franklin No. 01AP-461, 2004-Ohio-1460, ¶ 26, citing *LeRoux's Billyle Supper Club v. Ma*, 77 Ohio App.3d 417, 602 N.E.2d 685 (6th Dist.1991).

**{¶53}** The trial court found that the two corporations were indistinguishable because Thriftco had no employees, offices, phone lines, or business stationary, and its board was composed primarily of Charter One employees. The trial court further noted that Thriftco was significantly undercapitalized for the 75 Public Square investment and borrowed money from Charter One to purchase the property and fund the transaction. Finally, the court noted that even after transferring title of the property to Thriftco, Charter One continued to list 75 Public Square as an   asset on its commercial Real Estate Owned reports.

**{¶54}** Under the second *Belvedere* prong,[3] the trial court found that Charter One controlled Thriftco in a manner that constituted fraud. The court reasoned that the marketing material for 75 Public Square specifically referenced Charter One and "expressly and impliedly" represented that Charter One was the entity selling the property so that buyers would place greater confidence in the fact that an established bank was selling the property as opposed to an unknown entity like Thriftco.

**{¶55}** Under the third and final *Belvedere* prong, the trial court concluded that Charter One's control of Thriftco resulted in injuries to Northpoint. The trial court found that because Charter One represented itself as the seller of the property, it instilled greater confidence in Northpoint to buy the property and, as such, "discouraged" Northpoint from conducting its own inspections, which, in turn, decreased the risk of it discovering any defects prior to purchase of the property.

**{¶56}** Appellants argue that there was evidence that it was a corporate entity distinguishable from Charter One. Appellants claim that Thriftco was incorporated as a holding company, which normally do not have corporate staffs. According to appellants, all of Thriftco's legal documents were executed by Thriftco, and there was no evidence that Charter One personally or through others "intentionally caused misrepresentations or nondisclosures" that would constitute a finding of fraud.

**{¶57}** We find, however, that there is competent, credible evidence to support the

---

[3] The second *Belvedere* prong was modified and expanded by the Ohio Supreme Court in *Dombroski* to include unlawful acts. *Dombroski* at ¶ 28-29.

trial court's findings. Thriftco's board was comprised of Charter One's vice president, Charter One's executive vice president, Charter One's senior vice president, and one other member who served as Thriftco's president. Charter One's senior vice president, John Fulton, was the main contact person for the 75 Public Square project. From the record, the only non-Charter One member of Thriftco's board, Bill Boyd, had little involvement with the project, other than to inquire about the board's director and officers ("D&O") liability insurance.

{¶58} Thriftco had D&O insurance coverage of $20 million with no deductible; in fact, the board brought an advisor into their board meeting to remind them of their coverage before they signed off on the purchase of 75 Public Square. Thriftco only showed cash assets of $162,000, even though it was going to be investing $3 million by taking ownership in 75 Public Square. Again, Thriftco borrowed the money it needed for the investment from Charter One.

{¶59} In a February 22, 1996 memorandum to John Koch, who served as executive vice president of Charter One and vice president-secretary of Thriftco, from Lawrence Helm, vice president of both Thriftco and Charter One, Helm wrote:

> As we have discussed previously, title to the building should be vested in a
> service corporation in order to help shield the bank from potential liabilities
> inherent with ownership of a multi-tenant operating facility such as this
> project. In addition, as the building * * * is not currently within all city
> codes, the bank's assuming title could draw the attention of local building

authorities. Vesting of title in a service corporation may help defer their interest.

{¶60} A few days later, in a February 27 memorandum to Thriftco's board of directors, Helm wrote that the bank was considering having the property titled in a subsidiary instead of the bank due to potential liability and code violations. Helm continued:

> I am requesting the Board [of Thriftco] consider accepting title to this property until a sale of the asset can be arranged. The transaction, as anticipated, would require contribution of capital by the holding company * * *. The property, during its ownership, would be managed by [Charter One's] Facilities Department. All leasing, accounting and bill payment services would be provided by this department with an outside management firm to provide the necessary labor for cleaning, security and maintenance.
>
> The bank's mortgage would be initially assumed by Thriftco with a capital infusion arranged approximately in 4 months * * *.

{¶61} This evidences that Charter One was going to use Thriftco to shield itself from liability and the prying eyes of local authorities and potential buyers.

{¶62} As to the fraud that was committed, there is evidence supporting the trial court's conclusion that the appellants marketed the property as though they had already conducted all due diligence typically performed by prospective buyers.

{¶63} Charter One retained EMG prior to transferring the property into Thriftco's name. In EMG's proposal to Charter One, the company explained that its "marketing approach" included a "seller controlled marketing process"; as EMG noted, it "dislike[d] having buyers tie up our property while they perform their due diligence." As

part of the contract with Charter One, EMG would perform all due diligence work for the building up front to "put the best face on [the] property legally, cosmetically, physically and financially to maximize its appeal to buyers."

{¶64} EMG proposed to provide each potential buyer with a Property Information Packet, which would include property inspections and environmental reports, containing all due diligence information normally developed during a contingency period.   In its proposal, EMG stated, "[b]ecause all the information is provided up front in our process, we can move directly to a non-contingent contract.   * * * The less uncertainty in the purchaser's mind, the more comfortable he is and the higher the price he is willing to pay [for the property]."

{¶65} As part of the marketing plan, EMG created and provided each potential purchaser with a four-sided color brochure.   The front of the brochure prominently stated "BANK DIRECTS IMMEDIATE SALE 75 Public Square Building."

{¶66} This is the plan that EMG created and Charter One and Thriftco subscribed to.   By providing potential purchasers, including Northpoint, with reports from reputable companies, which indicated that there were no code violations and the water in the building was safe to drink, and by concealing and misrepresenting the condition of the fire-suppression and domestic water systems, the appellants fraudulently induced potential purchasers to rely on these reports, in part at least, because purchasers thought they were dealing with an established bank.

{¶67} When asked at trial how he relied on the Brandstetter and the Phase One

Environmental Assessment Reports, Dzina testified:

> I relied on the documents that were given to me. I mean, I was given reports that say there were no code violations and they were done by reputable people from the City of Cleveland and an environmental company, not once, but twice. Once in '96 and once four months before I bought the building that there were no problems, and I mean normally what you do with something like this, it would be a strictly an as-is with no documents, you'd have to do all your own reports. They were giving me reports. Why would you want to have them redone.
>
> * * *
>
> I relied on [the property inspection report.] That's what they said was wrong with the fire suppression system and that's what I did, I replaced the hoses * * * I replaced the things that were in that report. There was nothing in there about inadequate pressure, lines being cut off, needing a [fire] pump, that a safety expert had to be hired to do this.

{¶68} Dzina continued: "if I knew at that time that there was this life safety issue that was out there, of course I would have never paid the price I paid for the building, I would have negotiated the price to fix these items." He further testified that the seller was "a bank by God sake, this isn't like some stranger who is just trying to sell a building."

{¶69} Under the third *Belvedere* prong, whether injury or unjust loss resulted to Northpoint from such control and wrong, as we found under the previous assignment of error, the injury to Northpoint was the cost to repair its water lines and fire-suppression system.

{¶70} Based on these facts and our standard of review, we find that there was

competent credible evidence to support the trial court's decision to pierce the corporate veil and find Charter One liable for the acts of Thriftco.

**{¶71}** Accordingly, the second assignment of error is overruled.

## PUNITIVE DAMAGES

**{¶72}** In the third through fifth assignments of error, the appellants challenge the trial court's award of punitive damages to Northpoint.[4]

**{¶73}** "The purpose of punitive damages is not to compensate a plaintiff, but to punish and deter certain conduct." *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 651, 635 N.E.2d 331 (1994).

*Statutory Cap on Punitive Damages Does Not Apply*

**{¶74}** Effective April 7, 2005, the General Assembly capped punitive damages in tort actions at two times the amount of compensatory damages. R.C. 2351.21(D)(2)(a). The appellants argue that the trial court erred in failing to apply this cap to its punitive damages award. We disagree.

**{¶75}** This court has held that R.C. 2315.21 may not be applied retroactively. *Mastellone v. Lightning Rod Mut. Ins. Co.*, 175 Ohio App.3d 23, 2008-Ohio-311, 884 N.E.2d 1130, ¶ 17-21 (8th Dist.); *see also Blair v. McDonagh*, 177 Ohio App.3d 262,

---

[4]We note that the appellants failed to separately argue the fifth assignment of error, completely skipping over it in their brief, in violation of App.R. 12(A)(2) and 16(A). We could completely disregard this assignment of error, but use our discretion to discuss the third through fifth assignments of error together as they are interrelated.

2008-Ohio-3698, 894 N.E.2d 377 (1st Dist.); *Arndt v. P & M Ltd.*, 11th Dist. Portage Nos. 2007-P-0038 and 2007-P-0039, 2008-Ohio-2316. A court cannot apply the statute to a cause of action that arose before the statute's effective date even if some of the conduct giving rise to the cause of action occurred after the effective date. *Blair* at ¶ 40, citing *Van Fossen v. Babcock & Wilcox Co.*, 36 Ohio St.3d 100, 104-106, 522 N.E.2d 489 (1988).

{¶76} Here, the actions and/or omissions Northpoint argued warranted punitive damages arose starting in 1997 and continued until Northpoint completed the repairs to the building in 2000. Therefore, the current version of R.C. 2315.21 does not apply retroactively to that conduct.[5]

*Fraud as Basis for Punitive Damages*

{¶77} Former R.C. 2315.21(B) provided that punitive or exemplary damages are recoverable in a tort action if: (1) the defendants' actions or omissions "demonstrate malice, aggravated or egregious fraud, oppression, or insult," or the defendants "as principal or master authorized, participated in, or ratified actions or omissions of an agent or servant" and (2) the plaintiff has adduced proof of actual damages as a result of defendants' actions or omissions.

---

[5] We are aware that the version of R.C. 2315.21 that became effective January 27, 1997, capped punitive damages at three times the amount of compensatory damages. That version, however, was found to be unconstitutional in toto in *State ex rel. Ohio Academy of Trial Lawyers v. Sheward*, 86 Ohio St.3d 451, 715 N.E.2d 1062 (1999). The Ohio legislature did not amend R.C. 2315.21 again until 2001. Therefore, the statute in effect at the time the claims accrued in this case did not have a punitive-damages cap. *See* former R.C. 2315.21, effective date January 5, 1988.

**{¶78}** The appellants argue that because they did not authorize, participate in, or ratify EMG's actions, specifically the withholding of the Kaczmar Report from Northpoint, they cannot be assessed punitive damages. We disagree. Again, former R.C. 2315.21(B) provided that a party can be held liable for punitive damages in a tort action if (1) the party's actions directly demonstrated aggravated or egregious fraud; or (2) where the party authorized, participated in, or ratified such actions by its agent.

**{¶79}** Both this court and the trial court have already found that the defendants committed fraud. *See Northpoint I* at ¶ 64, 67. And, as will be discussed below, the trial court's finding that the fraud was egregious was supported by competent, credible evidence. Therefore, Charter One and Thriftco can be held liable irrespective of whether they authorized, participated in, or ratified EMG's withholding of the Kaczmar Report.

*9:1 Punitive Damages Award*

**{¶80}** The trial court awarded punitive damages in the amount of $3,269,448, which was nine times the amount of compensatory damages (employing the higher award of $363,272), and the amount Northpoint requested.

**{¶81}** A court reviewing an award of punitive damages for excessiveness must independently analyze (1) the degree of reprehensibility of the party's conduct, (2) the ratio of the punitive damages to the actual harm inflicted by the party, and (3) sanctions for comparable conduct. *Barnes v. Univ. Hosps. of Cleveland*, 119 Ohio St.3d 173, 2008-Ohio-3344, 893 N.E.2d 142, paragraph two of the syllabus (adopting the test set forth by the United States Supreme Court in *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559,

116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)).

{¶82} Thus, pursuant to *Barnes*, and with the goal of punishment and deterrence in mind, this court must analyze the punitive damages award for excessiveness using the *Gore* guideposts and do so independent of the trial court's discretion to impose punitive damages. In other words, we employ a de novo standard of review when determining whether an award of punitive damages is excessive.

{¶83} Of the three guideposts, "[p]erhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore* at 575. With respect to the reprehensibility factor, the United States Supreme Court has enumerated five typical indicia: (1) physical, as opposed to economic harm; (2) tortious conduct evidenced by indifference or reckless disregard to others, (3) financial vulnerability of the target, (4) repeated actions, and (5) harm resulting from intentional malice, trickery, or deceit. *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), citing *Gore* at 575.

{¶84} In its post-remand merit brief, Northpoint argued for a 9:1 ratio of punitive damages based on the "extreme reprehensibility of Charter One's conduct," relatively small amount of compensatory damages, and Charter One's net worth, which it estimated to be $46 billion.

{¶85} The trial court agreed, finding the defendants' actions were "especially egregious" because they knowingly jeopardized the health and safety of the users and

occupants of 75 Public Square by subjecting them to a contaminated drinking water supply and faulty fire-suppression system. The court found that the defendants' conduct demonstrated a reckless disregard for the health and safety of tenants, visitors, and potential purchasers of the property.

**{¶86}** The trial court also determined that the defendants materially misrepresented and intentionally concealed the dangerous and defective condition of the property to facilitate its sale to Northpoint. According to the court, the defendants conduct "involved repeated actions that were executed with malice, trickery, and deceit." Instead of correcting the issues with the drinking water and fire-suppression system, Charter One vested title of the property to Thriftco to shield itself from liability and deceive local authorities and potential buyers and, further, procured reports from companies that revealed no significant defects on the property while withholding information from the more damaging Kaczmar Report.

**{¶87}** The trial court also determined that the punitive damages award would deter the appellants' future conduct and that a large punitive damage award was appropriate based on the appellants' conduct, the small compensatory damage award, Charter One's net worth, and the potential harm of the appellants' conduct.

**{¶88}** The appellants contend that the large punitive damages award violated their rights to due process because there was no real danger to health or safety and the award exceeded the actual sale price of the property. According to the appellants, even after Northpoint found out about the building's defects, the company never told tenants to stop

drinking the water or closed the building for repairs. The appellants also argue that Charter One's net worth at the time of the sale was closer to $1.4 billion, not $46 billion, making the punitive damages award excessive. Finally, the appellants argue that the comparable sanction, or criminal fine, that could have been levied against them for theft by deception would have been $25,000, far less than the punitive damage award.

{¶89} In *Barnes*, 119 Ohio St.3d 173, 2008-Ohio-3344, 893 N.E.2d 142, the Ohio Supreme Court noted that both it and the United States Supreme Court have rejected a mathematical formula to assess the reasonableness of punitive damage awards. A low compensatory damages award "'may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages.'" *Id.* at ¶ 34, quoting *Gore*, 517 U.S. 559 at 582, 116 S.Ct. 1589. The Ohio Supreme Court has allowed a punitive damage award with a ratio of 6,250-to-one damages ratio to stand, but the court has also invalidated a 20-to-one ratio. *Barnes* at *id.*, citing *Wightman v. Consol. Rail Corp.*, 86 Ohio St.3d 431, 715 N.E.2d 546 (1999); *Dardinger v. Anthem Blue Cross & Blue Shield*, 98 Ohio St.3d 77, 2002-Ohio-7113, 781 N.E.2d 121. A large disparity is allowable because a punitive damages award is more about a defendant's behavior than the plaintiff's. *Wightman* at 439.

{¶90} We find that there was competent, credible evidence to support the trial court finding that the defendants' fraud was egregious. Although this case presents economic rather than physical harm, cases involving economic injury can warrant an award of

substantial punitive damages when the harm is committed "intentionally through affirmative acts of misconduct or when the party is financially vulnerable." *Gore* at 576.

Here we have affirmative acts of misconduct, which included, but were not limited to, the withholding of the Kaczmar Report and the pegged water pressure gauge on the 15th floor of the building. As the trial court noted, the occupants of 75 Public Square were subjected to a contaminated drinking water supply and faulty fire-suppression system on a daily basis. This was in a 15-story office building that, at the time the appellants owned it, was at 88% capacity and included a restaurant.

{¶91} The second guidepost considers the ratio of the punitive damages to the actual harm inflicted by the party. In *Gore*, *supra* at 581, the United States Supreme Court stated that "the proper inquiry is 'whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred.'" *Id.,* quoting *TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 460, 125 L.Ed.2d 366, 113 S.Ct. 2711 (1993). A court may rely on the difference between that figure and the harm to the victims "that would have ensued if the tortious plan had succeeded." *Gore* at *id.*

{¶92} Stojkov, who was hired by Northpoint, testified that because the check valve on the water pipe was missing, contaminated water was syphoning into the storage tank, which held water used for drinking water throughout the building. Stojkov testified that if you drank the contaminated water "you could get very sick, possibly die." Although there was no evidence that any of the defendants removed the check valve, they had

knowledge of the contaminated water. Lawrence Helm, vice president of Thriftco and Charter One, testified that he went through the building with the former owners before Charter One purchased the building. He testified "[former] management * * * mentioned * * * there had been some issue with the separation between the — in the water system, but to my knowledge, at that time they were telling me that it had been fixed, but there had been issues."

{¶93} Stojkov also testified that there was not enough water pressure to put out a fire after the fifth or sixth floor: "the pressure would be disastrous to try to put out a fire [without the assistance of the fire department]." Although Stojkov did not know when the pressure gauge on the 15th floor had been rigged or "pegged," he testified that it had been tampered with to show a consistent pressure. Schwartz, the building manager, had showed that pressure gauge to EMG's owner before the building was sold to Northpoint and the gauge read a low pressure, insufficient to run the sprinklers on the top floor.

{¶94} While the appellants point to the fact that Northpoint never closed the building, Stojkov testified that he did not recommend that Dzina evacuate the building. According to Stojkov, his primary concern was the contaminated drinking water. Dzina testified that he thought the building was safe when he bought it; but when he found out about the defective fire-suppression system he immediately cleared the 15th floor, took everything combustible out of it, and connected the six-inch water line to the three-inch water line prior to beginning repairs. Dzina testified he could not close the building to fix the fire-suppression system because he would lose all his tenants.

**{¶95}** Appellants also complain that the trial court erred in calculating Charter One's net worth at $46 billion and in relying on that figure. We find this claim specious as best. At trial, counsel for Charter One *expressly stipulated* that the net worth of Charter One Bank "for the purpose of the punitive damages is reflected in Plaintiff's Exhibit * * * 41." The only figure listed in Exhibit 41 are the bank's assets listed at $46 billion. Charter One contends that its assets differ from its net worth; however, we decline to find that the trial court erred in relying on Charter One's own stipulation.

**{¶96}** In so far as the third *Gore* guidepost, sanctions for comparable conduct, as the appellants pointed out, the maximum fine for theft by deception is $25,000, a fraction of the amount of the trial court awarded for punitive damages. *See* R.C. 2923.02. However, if one were to consider relevant civil penalties or sanctions in a case like this, it would be the potential civil damage award in a lawsuit for personal injury, which could yield a large damage award had someone been injured as a result of a fire or contaminated drinking water. *See Wrightman*, 86 Ohio St.3d at 441, 715 N.E.2d 546 (upholding a 6,250:1 punitive damages award and finding that the relevant sanction for comparable conduct was the "potential" civil damage award that could be in the millions of dollars).

**{¶97}** In this case, the trial court considered the facts and assessed the damages. Under the guidelines of *Gore*, *State Farm*, and *Barnes* as applied to the facts of this case, we cannot say the punitive damages in the amount of nine times compensatory damages were excessive so as to violate the appellants' due process protections. "There is no magic formula for determining the proper amount of punitive damages. Rather, the

amount that should be awarded is the amount that best accomplishes the twin aims of punishment and deterrence as to that defendant." *Dardinger,* 98 Ohio St.3d 77, 2002-Ohio-7113, 781 N.E.2d 121, at ¶ 178.

{¶98} However, because we found that the trial court erred in increasing the amount of compensatory damages, we remand the punitive damages award so the trial court can enter judgment of punitive damages in the amount equal to nine times the amount of compensatory damages: $2,520,000.

{¶99} Therefore, the third, fourth, and fifth assignments of error are sustained in part and overruled in part. The case is remanded for the trial court to enter a punitive damage award in the amount nine times the amount of compensatory damages.

**ATTORNEY FEES**

{¶100} In the sixth assignment of error, the appellants challenge the trial court's award of attorney fees.

{¶101} The appellants state that their sole basis for this assignment of error is that because the trial court erred in awarding punitive damages to Northpoint, it also erred in awarding attorney fees to the company. The appellants expressly state that they are not challenging the amount of attorney fees awarded to Northpoint.

{¶102} Attorney fees may be awarded as an element of compensatory damages where the finder of fact finds that punitive damages are warranted. *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 558, 644 N.E.2d 397 (1994), citing *Columbus Fin., Inc. v. Howard*, 42 Ohio St.2d 178, 183, 327 N.E.2d 654 (1975). Because we upheld the trial

court's decision to award punitive damages in this case, the court was also within its discretion to award attorney fees to Northpoint.

{¶103} The sixth assignment of error is overruled.

**PREJUDGMENT INTEREST**

{¶104} In the seventh assignment of error, the appellants argue that the trial court erred in awarding prejudgment interest to Northpoint.

{¶105} R.C. 1343.03 permits the trial court to award prejudgment interest if it finds the tortfeasor failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case.

{¶106} The award of prejudgment interest encourages the "settlement of meritorious claims, and the compensation of a successful party for losses suffered as the result of the failure of an opposing party to exercise good faith in negotiating a settlement." *Lovewell v. Physicians Ins. Co. of Ohio*, 79 Ohio St.3d 143, 147, 679 N.E.2d 1119 (1997).

{¶107} For purposes of prejudgment interest, a lack of good faith is not the equivalent of bad faith. *Kalain v. Smith*, 25 Ohio St.3d 157, 159, 495 N.E.2d 572 (1986). The Ohio Supreme Court has held that a trial court should not award prejudgment interest where the tortfeasor (1) fully cooperated in discovery, (2) rationally evaluated risks and potential liability, (3) did not attempt to delay the proceedings unnecessarily, and (4) made a good-faith monetary settlement offer or responded in good faith to an offer from the

other party. *Id.* at the syllabus. Whether a party's settlement efforts were made in good faith is a decision committed to the sound discretion of the trial court; absent an abuse of discretion, the court's decision should not be reversed on appeal. *Andre v. Case Design, Inc.*, 154 Ohio App.3d 323, 2003-Ohio-4960, 797 N.E.2d 132, ¶ 9 (1st Dist.).

{¶108} Appellants argue that they made a good faith effort to settle the case, tendering oral offers to settle the case for between $30,000-$40,000 before trial and between $250,000-$300,000 after *Northpoint I* was released. Appellants claim that their initial $30,000-$40,000 settlement offer was reasonable and they cannot be said to have engaged in bad faith evaluation of their lack of liability when they came to the same legal conclusion as the trial court before the court was reversed by *Northpoint I*.

{¶109} Northpoint contends that the appellants made no offer to settle the case during the litigation, even though counsel for Charter One advised the bank that its potential liability could reach $5.9 million. Northpoint, however, made a pretrial settlement demand of $225,000 in 2005 and a $2 million settlement demand after *Northpoint I* was released.

{¶110} The trial court found that the appellants failed to make a good faith effort to settle the case, but Northpoint did make a good faith effort. The court reasoned that appellants never tendered a monetary offer and did not have an objective, reasonable belief that they had no liability. Northpoint's settlement demands, on the other hand, were rationally based on its evaluation of the case. The court determined that prejudgment interest on the compensatory damages was warranted in the amount of $201,690.60.

{¶111} After reviewing the hearing transcript and evidence submitted to the trial court, we cannot say that the trial court abused its discretion in finding that Northpoint negotiated in good faith and appellants did not negotiate in good faith. Northpoint initially made a settlement demand of $300,000 but dropped it to $225,000 during mediation. Charter One did not make an offer. After *Northpoint I* was released, the parties discussed settlement and Northpoint issued a demand for $2 million, but Charter One never countered. Although throughout the years of litigation Charter One's attorney had settlement authority of $280,000, the hearing testimony and accompanying exhibits show that counsel never tendered a settlement offer to Northpoint.

{¶112} In light of the above, the trial court did not abuse its discretion in awarding prejudgment interest to Northpoint. However, because we have reduced compensatory damages to $280,000, the case is remanded for calculation of the amount of prejudgment interest based on that amount.

{¶113} The seventh assignment of error is overruled.

**JUDGMENT AND REMAND INSTRUCTIONS**

{¶114} Judgment is affirmed in part and reversed in part. We remand the case for the trial court to enter judgment in favor of Northpoint and against the defendants, jointly and severally, in the amount of $280,000 for compensatory damages and $2,520,000 for punitive damages, and to recalculate the amount of prejudgment interest due to Northpoint. The judgment awarding attorney fees to Northpoint is affirmed.

{¶115} The case is remanded for proceedings consistent with this opinion.

It is ordered that appellee recover of appellants costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LARRY A. JONES, SR., PRESIDING JUDGE

EILEEN T. GALLAGHER, J., CONCURS;
TIM McCORMACK, J., CONCURS IN PART
AND DISSENTS IN PART WITH SEPARATE
OPINION

TIM McCORMACK, J., CONCURRING IN PART, DISSENTING IN PART:

**{¶116}** I join with the majority in the disposition of the issues regarding the compensatory damages and piercing the corporate veil. I respectfully dissent on the issue of punitive damages. My analysis of the *Barnes* factors shows that an award of punitive damages nine times the amount of compensatory damages is excessive, unwarranted under the full circumstances of this case. A nine-to-one punitive damages award warrants greater scrutiny, as "*few* awards exceeding a single-digit ratio" will satisfy due process. (Emphasis added.) *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 425, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). While targeted punitive damages may well be

appropriate in this case, I do not find this punitive damages award of a nine-to-one ratio, an award which would amount to approximately 80 percent of the total value of the subject property, to be one of those few cases that warrant a punitive damages award near double digits.

{¶117} Our duty as an appellate court is to review a punitive damages award de novo by conducting our own thorough and independent review of the record and governing law. *Cooper Industries, Inc., v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436, 441, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). In *Barnes*, the Supreme Court of Ohio adopted a tripartite test to evaluate punitive damages for compliance with due process requirements set forth by the United States Supreme Court in *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Under the test, we must examine: (1) the "degree of reprehensibility"; (2) "the disparity between the harm or potential harm suffered by the plaintiff and the punitive damages award"; and (3) the difference between the award and appropriate civil or criminal damages. *Barnes,* 119 Ohio St.3d 173, 2008-Ohio-3344, 893 N.E.2d 142*,* at ¶ 32. Of particular importance to this case are the first two factors.

{¶118} The most important indicium of the reasonableness of a punitive damages award under the *Barnes* tripartite test is the degree of reprehensibility. *Barnes* at ¶ 33. Reprehensibility is measured by several factors, but pertinent to this case are: (1) whether "the harm caused was physical as opposed to economic"; and (2) whether "the tortious conduct evinced an indifference to or a reckless disregard of the health and safety

of others." *Barnes* at ¶ 33, citing *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

{¶119} Here, regarding the degree of reprehensibility under the first *Campbell* factor, the record shows that the harm caused by appellants' failure to disclose was purely economic. In the prior appeal, this court concluded that the "cost to repair," an economic standard used in cases involving fraud in the sale of real estate, was the appropriate measure of damages. This court noted that the appellee spent $280,000 to repair the water and fire suppression lines and for the purchase of a new pump. These are economic harms. Physical harm to the tenants of the subject building did not occur as a result of appellants' conduct. Without physical harm, the degree of reprehensibility is necessarily lessened, warranting a more limited punitive damages award.

{¶120} Turning to the second *Campbell* factor, i.e., an indifference to or a reckless disregard of the health and safety of others, appellants' failure to provide the Kaczmar-Pyramid Report and the fire inspector's recommendations was a purposeful omission that warrants an appropriate punitive award. The Kaczmar-Pyramid Report advised that a fire-protection expert be retained to "recommend changes to the sprinkler, standpipe, fire hose cabinet and pump system," and the fire inspector noted that the fire and water systems were tied together and that water pressure was insufficient to run the 15th floor sprinklers.

{¶121} However, it is relevant and important to note that appellants did provide appellee with the Brandstetter Report, which reflected similar concerns with the building's fire suppression system and pointed out specific areas requiring attention. It stated:

There are presently no standpipes in the stairwells, which does not comply with today's code requirements for a high rise building. The fifteenth floor is sprinklered from the domestic water system with the booster pumps in the basement. There are fire hoses located throughout the building. For these to be effective, the water pressure should be verified. It is questionable whether the fire department would want these to remain in service.

Thus, the record shows appellee was generally apprised of the deficiency of the building's fire system. Furthermore, the purchasing paperwork specified that the building was being sold in its "as is" condition. The purchase agreement also indicated that buyers could only rely on their own inspections and investigations of the property; appellee obtained no property inspection of its own. Both of these factors reflect a lesser degree of reprehensibility under the first prong of the *Barnes* analysis.

{¶122} Turning to the second *Barnes* factor, that is, "the disparity between the harm or potential harm suffered" and the award, the record indicates appellee itself contributed to the potential harm posed by the deficient conditions of the building's fire suppression and drinking water system. Appellee's witness Stojkov, who repaired the system, testified that if one drank the contaminated water, one "could get very sick, possibly die." Despite its awareness of the problem, appellee did nothing to warn its tenants, but instead allowed them to continue drinking the water notwithstanding its potentially contaminated nature. Furthermore, the same complacency of appellee was demonstrated with the fire suppression system, because repairs did not begin until 1999 and were not completed until

2000, three years after the purchase of the property. Once again, appellee did not evacuate the building regardless of the potential harm. Instead, appellee admitted that it did not disclose the fire suppression issues because it would lose tenants. In deciding the reasonableness of the punitive damages award, we must consider the actual or potential harm inflicted on the plaintiff; here, the circumstances show that appellee itself shared by contributing greatly to the potential harm in failing to timely remedy the deficient conditions. This factor also warrants a reduction of the punitive damages award.

{¶123} Furthermore, in assessing the second factor, the Supreme Court of Ohio recognized that "'low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages.'" *Barnes*, 119 Ohio St.3d 173, 2008-Ohio-3344, 893 N.E.2d 142, at ¶ 34, quoting *Gore*, 517 U.S. at 582, 116 S.Ct. 1589, 134 L.Ed.2d 809. This case is not one of a low compensatory award, because appellee was awarded its full economic damages; therefore, a high punitive damages award at a nine-to-one ratio, which exceeds the value of the property, is disparate.

{¶124} This court "'has the same unlimited power and control of verdicts and judgments as the trial court and may weigh the evidence and exercise an independent judgment upon questions of excessive damages and when no passion or prejudice is apparent may modify and affirm the judgment by ordering a remittitur with the consent of the prevailing party.'" *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 654, 635 N.E.2d 331(1994), fn. 6, quoting *Chester Park Co. v. Schulte*, 120 Ohio St. 273, 166 N.E.

186 (1929). Appellants in this case filed a motion for reconsideration and reduction of the punitive damages, asking the trial court to reduce the punitive damages to the statutory two-to-one ratio. Because neither the degree of reprehensibility is so high nor the actual or potential harm inflicted so great to justify a near double-digits ratio under the circumstances of this case, the punitive damages award should have been reduced to satisfy due process. *Gore* at 568. Although R.C. 2315.21 is inapplicable as it was not yet in effect, based on the foregoing analysis, the trial court should have applied a ratio comparable to the statute and granted appellants' motion for a reduction of the punitive damages award.