[Cite as *Herhold v. Smith Land Co., L.L.C.*, 2019-Ohio-2418.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

SHAWN A. HERHOLD, et al.

    Appellees

    v.

THE SMITH LAND COMPANY, et al.

    Appellants

C.A. No.     28915

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CV 2008 05 3634

DECISION AND JOURNAL ENTRY

Dated: June 19, 2019

CARR, Judge.

**{¶1}** Defendants-Appellants Smith Land Company, LLC ("Smith Land") and Robert G. Smith appeal from the judgments of the Summit County Court of Common Pleas. This Court affirms.

## I.

**{¶2}** This appeal stems from the sale of a vacant lot on Brunsdorf Road ("the Property") in Fairlawn. In July 2002, then husband and wife, Plaintiffs-Appellees Shawn Herhold and Malavanh Herhold, nka Rassavong (collectively "the Herholds") purchased the Property from Smith Land and its president and sole shareholder, Robert Smith (collectively, "the Defendants"). The deed for the Property was recorded in September 2002. According to the Herholds, the Defendants represented to them that they would be able to build a home on the Property. Later, however, when the Herholds attempted to sell the Property, they discovered that the City of Fairlawn would not issue a building permit for the Property absent permission from

the Ohio Environmental Protection Agency ("Ohio EPA"). In order to satisfy Ohio EPA, the Herholds removed numerous truckloads of fill dirt from the north boundary of the Property in order to restore the wetlands that were previously there. Such action created a ditch and decreased the buildable surface area of the Property. After the alterations to the Property, the Herholds were unable to sell it.

{¶3} The Herholds brought suit against the Defendants, and others who are not relevant to this appeal, for breach of contract, breach of the warranty of title, fraud, misrepresentation, and fraudulent concealment/inducement. The Herholds sought compensatory damages, punitive damages, interest, and attorney fees.

{¶4} Ultimately, the matter proceeded to a jury trial. The jury found in favor of the Herholds and awarded them $55,000 on their breach of contract claim, $65,000 on their fraud claims, and $35,000 in punitive damages. Additionally, the jury determined that the Herholds should be awarded their attorney fees. The Herholds were awarded $39,744 in attorney fees, $32,407.82 in prejudgment interest on their contract claim, and $36,854.91 in prejudgment interest on their fraud claims.

{¶5} The Defendants filed a motion for judgment notwithstanding the verdict, or in the alternate, a motion for new trial. In the end, a new trial was ordered on all of the Herholds' claims.[1]

{¶6} The Defendants then moved to reopen discovery, however, the request was denied. The matter proceeded to a second jury trial. The jury again found in favor of the Herholds. The Herholds were awarded $36,700 on the breach of contract claim, $26,485.07 in

---

[1] A more detailed history of the case, including a discussion of the intervening appeals, can be found at *Herhold v. Smith Land Co., LLC*, 9th Dist. Summit No. 28032, 2016-Ohio-4939.

prejudgment interest on the breach of contract claim, $5,300 on the fraud claim, $3,341.66 in prejudgment interest on the fraud claim, $165,000 in punitive damages, and $48,062.55 in attorney fees. Subsequently, the Defendants filed a motion for judgment notwithstanding the verdict, or, in the alternate, a motion for a new trial. The trial court denied the motions.

{¶7} The Defendants have appealed, raising seven assignments of error, which will be addressed out of sequence to facilitate our analysis.

II.

## ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED AS A MATTER OF LAW IN DENYING SMITH LAND COMPANY AND ROBERT SMITH'S MOTIONS FOR DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT PURSUANT TO CIV.[R.] 58 ON THE HERHOLDS['] BREACH OF CONTRACT CLAIM.

{¶8} The Defendants assert in their fourth assignment of error that the trial court erred in denying their motion for directed verdict and for judgment notwithstanding the verdict on the Herholds' breach of contract claim.

> The test to be applied by a trial court in ruling on a motion for judgment notwithstanding the verdict is the same test to be applied on a motion for a directed verdict. The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions.

(Internal quotations and citations omitted.) *Jackovic v. Webb*, 9th Dist. Summit No. 26555, 2013-Ohio-2520, ¶ 15. Both rulings are reviewed by this Court de novo. *Id.*

{¶9} "Generally, a breach of contract occurs when a party demonstrates the existence of a binding contract or agreement; the non-breaching party performed its contractual

obligations; the other party failed to fulfill its contractual obligations without legal excuse; and the non-breaching party suffered damages as a result of the breach." (Internal quotations and citations omitted.) *Envision Waste Servs., LLC v. Cty. of Medina*, 9th Dist. Medina Nos. 15CA0104-M, 15CA0106-M 2017-Ohio-351, ¶ 14.

## Background

**{¶10}** The Herholds presented evidence supporting the following narrative. The Defendants did not present any witnesses on their behalf.

**{¶11}** Woodbury Estates, where the Property is located, was platted in November 1999. Smith Land was the proponent of the plat map and the owner of the land. The allotment originally contained 10 lots. They were numbered 1 through 9 and an additional lot was labeled as block A. Ultimately, block A would be later split into lots, one of which is the Property.

**{¶12}** Earlier in 1999, Smith Land, through a consultant, submitted a report delineating the wetlands in the land for verification by the United States Army Corps of Engineers. The report identified 5.54 acres of jurisdictional wetlands. Lee Robinette with the United States Army Corps of Engineers went out to the area to field verify the presence and location of wetlands. She then sent a verification letter to Smith Land's consultant.

**{¶13}** The plat was reviewed by the zoning and engineering departments of the City of Fairlawn. Before the plat was approved, the city engineer requested that certain restrictions be placed on the map. One of those restrictions stated that, "[t]he lands delineated on this plat as wetlands are jurisdictional waters of the United States under the Federal Clean Water Act, and in order to fill any of the delineated wetlands, not shown on this plat as to be filled, a permit must be obtained from the U.S. Army Corps of Engineers." Once effective, those restrictions "run[] with the land" and "future development has to adhere to those restrictions." If at some point,

someone desired to change or remove a restriction, that person would have to contact the planning commission and fill out an application to have the plat updated. No one has ever asked that any of the restrictions be removed. Christopher Randles with the Building and Zoning Commission for the City of Fairlawn was of the opinion that, until the restrictions are removed, they must be followed.

{¶14} Notably, block A, where the Property would ultimately be, was composed of wetlands that were not designated as "to be filled[.]" Thus, Mr. Randles opined that if someone was going to put fill in block A, that person would need a permit. Lot 5, however, did contain the designation that a portion was "to be filled[.]" At one of the planning commission meetings in November 1999, Karen-Edwards Smith, Mr. Smith's wife, the vice-president of Smith Land, and also an attorney, appeared on behalf of Smith Land. Ms. Edwards-Smith told the commission that the lots will only appeal to certain individuals. Those people "would be ones that are interested in having a wetlands surrounding because the contracts that are signed as to purchasing these, as well as the plats, reflect that they do not have the right to go in and fill the wetlands without Army Corps of Engineers' permits." Ms. Smith told the commission that, "if the city does grant the lot splits as indicated that no way are we making any representations of building ability of the land itself."

{¶15} In February 2000, Ms. Robinette's office received a report of a potential unauthorized wetland fill project on Smith Land's property. Employees of the United States Army Corps of Engineers visited the site and discovered that .5 acre of wetland had been filled. Under what was known as a Nationwide Permit or NWP number 26, any impact to wetlands over one-third of an acre and up to three acres required prior notification and mitigation planning. Mitigation planning involves the purchase and, thus preservation, of other wetlands so that there

is not a net loss of wetlands. Smith Land did not notify the United States Army Corps of Engineers about the fill and did not mitigate for the impacted wetlands. Accordingly, United States Army Corps of Engineers determined the project was not in compliance with NWP number 26.

{¶16} Subsequently, Smith Land applied to the United States Army Corps of Engineers to fill .945 acre of jurisdictional wetland and to mitigate the impact by purchasing 2 acres of wetlands elsewhere. In submitting the application, Smith Land included a map of the proposed fill that included the restriction about wetlands that was on the previous plat map. The proposed fill area included a portion of what would become the Property.

{¶17} In April 2000, Smith Land received a letter from the United States Army Corps of Engineers authorizing the work under NWP number 26. The permit was valid until February 11, 2002, unless activity commenced or was contracted to commence prior to that date, in which case Smith Land would have an additional 12 months to complete activity under the permit. The letter concluded by noting that "[a]ny impacts to the remaining 4.609 acres of jurisdictional wetlands on the subject property would require authorization from this office. Please be aware that the nationwide permit authorization does not obviate the requirement to obtain state or local assent required by law for the activity." The City of Fairlawn was never notified of a violation of the permit. Further, Ms. Robinette was unaware of her office issuing any violation of the permit but she also noted that she was unaware of the United States Army Corps of Engineers being asked to evaluate the land as to whether there was a violation.

{¶18} Around that time, Smith Land also requested that the city planning commission split block A into three lots. The letter from the United States Army Corps of Engineers was referenced during the planning commission meeting and it and the attachments were considered

by the commission. Block A was ultimately split into three lots, one of which became the Property.

{¶19} The plat map that designates the splitting of block A includes what is labeled a "Note" that specifies that "[t]he lands delineated on this plat as wetlands are jurisdictional waters of the United States under the Federal Clean Water Act and in order to fill any of the delineated wetlands, not shown on this plat as to be filled, a permit must be obtained from the U.S. Army Corps of Engineers." In May 2000, a deed was issued from Smith Land to Smith Land to address the splitting of the lots of block A. That deed did not contain the notation concerning the wetlands that was on the plat map.

{¶20} In 2002, the Herholds were looking for a vacant lot upon which to build a home. Mr. Herhold first came across the Property and noticed that it was level and freshly graded with woods in the backyard. He observed that it appeared to have fresh dirt as "it was graded, so you could tell that it had just been recently worked up because it was like nice, flat, level." After showing the Property to Ms. Rassavong, Mr. Herhold met Mr. Smith at the Property.

{¶21} Mr. Smith told Mr. Herhold that Mr. Smith had purchased the land in the area and divided it up into lots. Mr. Smith informed Mr. Herhold that Mr. Smith was building a house on a lot further down, lot 5, and the lot was very similar to the Property. Mr. Herhold said that Mr. Smith used lot 5 as an example of what Mr. Herhold would be able to do. Mr. Smith "was being very encouraging, * * * he was showing [Mr. Herhold] the house he [was] doing just down the road, saying that it is a buildable lot." Mr. Smith did advise Mr. Herhold that he would need a little bit of extra stone for the foundation and that would cost about $5,000 extra as compared to an average house. Additionally, Mr. Smith told Mr. Herhold that there was some fill dirt on the Property that he had brought in and that "he was allowed to bring fill dirt in there." Mr. Smith

indicated that there were wetlands at the back of the Property and showed Mr. Herhold how far back the Property went into the wetlands. However, Mr. Smith did not tell them that the Property had been filled over wetlands.

{¶22} Thereafter, Mr. Herhold brought family members and his wife out to the Property several times. He estimated that he had been out to the Property at least 10 times at the point he made an offer. In making the offer, Mr. Herhold informed Mr. Smith that he "wanted to make sure that everything was okay with the piece of property, like [Mr. Smith] had said, that it was a buildable lot. * * * [Mr. Herhold] wanted something in [the agreement] to state that it was a buildable lot, and [Mr. Smith] said that was not a problem." Ms. Rassavong added that, due to the visible wetlands in the back, they wanted some assurance that the Property was buildable.

{¶23} The top of the "Real Estate Purchase Agreement" included a handwritten notation that the "Seller to provide documentation that lot is buildable with fill dirt." There is also an asterisk near the notation which states "See Addendum A[.]" The handwritten notation appears to be initialed by Mr. Smith and the Herholds. The Herholds understood that this notation meant that, with the fill dirt already on the Property, the lot was a buildable lot.

{¶24} The Real Estate Purchase Agreement also included an "'AS IS' Clause[,]" which was part of the form agreement. It stated:

> Buyer agrees and acknowledges that the property is being conveyed "AS IS" and that neither Seller, Broker, nor Agent have made any representations or warranties, either expressed or implied, regarding the property including, but not limited to, soil conditions, environmental conditions, flooding or flood zone, availability of septic or sewer, availability or condition of well or city water, availability of public utilities, feasibility for construction, zoning, easements, surveying or boundaries, and deed restrictions. Buyer has the sole responsibility to inspect the property before signing this Agreement. Broker or Agent assume no liability for the condition of the property at any time before or after delivery of the deed.

This Agreement is contingent upon an inspection of the property for its suitability for Buyer's intended purpose, including septic/sewer permits and preliminary title search, within sixty (60) days form the date of acceptance of this Agreement. Inspections to be performed by Buyer at Buyer's expense. If Buyer is not satisfied with the condition of the property then Buyer shall notify Seller within the inspection period and Seller may either correct the unsatisfactory condition or void this Agreement in which case all monies held in trust shall be returned to Buyer without further liability between Seller, Buyer, or Broker. If Buyer does not inspect, then the inspection is waived and Buyer takes the property in its present "AS IS" condition. After inspection and correction, if any, and delivery of deed Buyer accepts the property "AS IS". Buyer shall be responsible for the repair and restoration of any damage to the property which may be caused by the inspections.

{¶25} The Real Estate Purchase Agreement was signed by the Herholds and Mr. Smith, whose signature was followed by "Pres[,]" under which appeared "Smith Land Co. Inc." Mr. Herhold acknowledged that he did not have any inspections done nor did he contact the City of Fairlawn or Ohio EPA.

{¶26} The "Addendum to Sales Contract" provides that "[t]he subject site will be required to be engineered by a company such as Messmore Engineering or Summit Testing. As with sub lot 5 * * * Messmore required a base of 1's and 2's (stone) in the construction area under the footer and basement floor. The fill used on sub lot 5 is approximately the same level of fill used on the subject lot." The addendum was signed by the Herholds and Mr. Smith on July 11, 2002.

{¶27} Mr. Smith also completed a disclosure form. That document lists "Smith Land" as the seller but it is signed by Mr. Smith and the Herholds. With respect to the question, "Are you aware of any violation of either Federal or State Environmental Protection Agency rules or regulations?[,]" the "NO" box is checked. The disclosure form also reflects, inter alia, that the seller did not know of any flooding, drainage, or grading problems on the Property, did know that the Property was designated as a wetland by a federal or state governmental agency, did not

know of any violations of local, state or federal laws, building codes and/or zoning ordinances affecting the Property, and did not know of any excessive settling, slippage, sliding erosion, or other soil stability problems on the Property. The end of the form states "[t]he above information is true and correct to the best of my knowledge and, except as set forth herein, no material problems exist with respect to the property as of the date below. I further agree to notify Purchase[r] of any additional items which may become known to me prior to the recording of the deed." Mr. Herhold testified that he relied on the disclosure form when he made an offer on the Property.

{¶28} The Herholds purchased the Property for $55,000. Mr. Herhold averred that when he did so he believed that he purchased a buildable lot. Based on the representations made to him, Mr. Herhold believed that all he had to do to build on the lot was to add some extra stone for the foundation as specified in the Addendum. The deed was filed September 4, 2002.

{¶29} Shortly after purchasing the Property, in November 2002, Mr. Herhold, who was in the United States Navy Reserve, was deployed to Japan for nearly a year. When Mr. Herhold returned almost a year later, the couple decided that, due to their circumstances, they should sell the Property.

{¶30} In 2003 Ms. Robinette was contacted by a law firm representing the City of Fairlawn to revisit the area containing the Property to re-verify the limits of United States Army Corps of Engineers jurisdiction over the wetlands. In 2004, Ms. Robinette visited the land to do so. She explained that a ruling had come out in January 2001 known as the "SWANCC" decision. *See Solid Waste Agency of N. Cook Cty. v. United States Army Corps of Engineers*, 531 U.S. 159 (2001). Ms. Robinette opined that that decision provided "that in order for a wetland to be considered a water of the United States, it had to have a physical connection, and it

had to exhibit a connection, meaning a conveyance, to a surface water tributary system." Thus, from that date forward, any water determined to be isolated would be outside federal jurisdiction. When Ms. Robinette visited the land she discovered that the wetlands did not have such a connection and thus were isolated wetlands. Therefore, they were no longer under federal jurisdiction. According to Ms. Robinette, federal jurisdiction ceased as of the date of her determination, which was February 4, 2004. Thus, she opined that prior to her finding in 2004, the United States Army Corps of Engineers retained jurisdiction over the area. However, following her determination there would be no need to obtain a permit from the United States Army Corps of Engineers to place fill in the area. At the point of her determination, jurisdiction over the isolated wetlands would be with Ohio EPA. Mr. Wilk agreed that Ohio EPA did not have jurisdiction over the isolated wetlands until 2004.

{¶31} In 2004, the Herholds listed the Property for sale. In September 2004, the Herholds received an offer of $61,900; however, that offer ultimately fell through. In December 2004, the Herholds received another offer to purchase the Property for $61,900. Before the sale closed, the Herholds discovered that the City of Fairlawn would not issue a building permit for the Property. Mr. Randles sent the prospective buyer a letter dated April 1, 2005. That letter informed the prospective buyer that any construction on the lots in block A may impact the wetlands. Therefore, Mr. Randles stated that it would be necessary to obtain permission from Ohio EPA for any such work. According to Mr. Randles, the city would not issue a building permit until the foregoing was accomplished. Thus, they were unable to complete the sale.

{¶32} Mr. Herhold then talked to the City of Fairlawn to figure out what precisely was the problem with the Property. Mr. Herhold talked to Mr. Randles and Mr. Wilk with Ohio EPA. Mr. Wilk came to understand that the United States Army Corps of Engineers had classified the

area, which included the Property, as isolated and outside of federal jurisdiction. Mr. Wilk visited the Property and observed that, in looking at the map that accompanied the federal permit, the fill on the Property surpassed the allowable amount by a "great margin." Mr. Wilk testified that Mr. Herhold's options were to either remove the fill dirt and reestablish the wetlands or to submit an after-the-fact-application to allow the fill dirt to remain and to purchase mitigation. Mr. Wilk opined that mitigation would be very expensive.

{¶33} Mr. Herhold averred that, before he could get a building permit from the City of Fairlawn, he had to obtain permission from Ohio EPA. Mr. Randles indicated that it was the city's position that it would require anybody coming in for a building permit to obtain approval from either the Army Corps of Engineers or Ohio EPA and that the person would need to have the soil tested to determine whether an engineered foundation would be necessary. Mr. Herhold averred that he was required to remove about forty dump trucks full of fill from the Property and plant vegetation in the area to reestablish the wetlands. He testified that it was not a buildable lot with the fill dirt because it was excessive fill. In removing the excessive fill, Mr. Herhold had to put a ditch along the north side of the Property. Making these alterations to the Property "made the lot very, very narrow" as the Herholds had to slope the area around the ditch which then "encroached heavily on the width of the property." In addition, Mr. Herhold had to get the land drilled and tested. That company estimated that it would cost $15,000 to $20,000 to put in a foundation at the Property.

{¶34} In October 2005, Mr. Wilk sent Mr. Herold a letter summarizing the situation and Mr. Herold's response to it. Mr. Wilk noted that the Property "failed to comply with the notification condition of the Army Corps of Engineers to properly fill a wetland. The wetlands on the property were filled by Smith Land Company over the allowable limits at the north

property boundary." The letter noted that Mr. Herhold had opted to remove the fill dirt and reestablish the wetland and that Mr. Wilk had inspected the work and found that the fill had been removed. When asked what state laws would apply, Mr. Wilk indicated that R.C. 6111.03 did, which he averred dealt with isolated wetlands and was enacted in 1982. Nonetheless, Mr. Wilk indicated that his actions involving the Herholds were not enforcement actions by Ohio EPA and instead his job at the time was "to help the Herholds out to meet the conditions as required by the City of Fairlawn so they c[ould] proceed with the building permit."

{¶35} During the sale process, Mr. Smith never told Mr. Herhold that it would be necessary to make those alterations to the Property, nor did Mr. Smith ever tell him there was unauthorized fill on the Property. Mr. Herhold indicated that had he known there was unauthorized fill on the Property he would not have purchased it. Mr. Herhold opined that the Property is no longer "a desirable piece of land" and "nobody wants to purchase [the Property] now." Mr. Herhold stated that they have not had any offers even after offering the Property in the thirty thousand dollar range. Nonetheless, he testified that the City of Fairlawn now would issue a building permit if they applied for one because of the alterations Mr. Herhold made.

### Breach of Contract Claim

{¶36} The Herholds claimed that Mr. Smith and Smith Land breached the contract by failing to disclose the unauthorized fill and by representing that the Property was buildable in the condition the Herholds received it when it was not.

{¶37} Viewing the evidence in a light most favorable to the Herholds, we conclude there was evidence from which a jury could find that Mr. Smith and Smith Land breached the contract. The Herholds were aware that the Property contained wetlands and fill dirt. Partly because of that, Mr. Herhold informed Mr. Smith that he "wanted to make sure that everything was okay

with the piece of property, like [Mr. Smith] had said, that it was a buildable lot. * * * [Mr. Herhold] wanted something in [the agreement] to state that it was a buildable lot, and [Mr. Smith] said that was not a problem." At the top of the page of the contract labeled "Real Estate Purchase Agreement[,]" there is a handwritten notation that states "Seller to provide documentation that lot is buildable with fill dirt." Mr. Herhold testified that "they[,]" presumably referring to Mr. Smith and/or Smith Land, wrote that into the agreement. There is also an asterisk near the notation which states "See Addendum A[.]" The handwritten notation appears to be initialed by Mr. Smith and the Herholds. The Herholds testified without objection that they understood that this notation meant that, with the fill dirt already on the Property, the lot was a buildable lot. The "Addendum to Sales Contract" provides that "[t]he subject site will be required to be engineered by a company such as Messmore Engineering or Summit Testing. As with sub lot 5 * * * Messmore required a base of 1's and 2's (stone) in the construction area under the footer and basement floor. The fill used on sub lot 5 is approximately the same level of fill used on the subject lot." The addendum was signed by the Herholds and Mr. Smith.

{¶38} When the Herholds went to sell the Property they came to discover that a building permit would not be issued by the City of Fairlawn for the Property absent permission from Ohio EPA. In working with Ohio EPA, the Herholds came to understand that there was excess fill dirt placed on the Property by Smith Land and that they would have to remove that excess fill dirt in order to satisfy Ohio EPA.

{¶39} Given the foregoing, along with the other circumstances discussed in great detail above, the trier of fact could conclude that Mr. Smith and Smith Land breached the contract by failing to sell the Herholds a buildable lot. There was evidence to support the notion that the City of Fairlawn would not grant the Herholds a building permit for the Property in the

condition it was sold to them. Thus, a reasonable trier of fact could conclude that the lot was not buildable as sold.

{¶40} In arguing that there was no breach of contract, the Defendants additionally point to the "AS IS" provision in the contract which also provides for inspections by the purchasers. However, the Defendants have failed to cite any case law to support their contention. *See* App.R. 16(A)(7). Instead, in a conclusory fashion, they maintain that the Herholds' damages were caused by their failure to inspect the Property. They develop no argument explaining why the "AS IS" clause and provision for inspections should trump the handwritten notation at the top concerning buildability of the Property which was initialed by Mr. Smith and the Herholds. *See* App.R. 16(A)(7). Thus, we cannot say that the Defendants met their burden on appeal on this issue.

{¶41} The Defendants additionally contend that there was no breach of contract because, upon acceptance of the deed, the contract merged into the deed.

{¶42} "The doctrine of merger by deed holds that whenever a deed is delivered and accepted without qualification pursuant to a sales contract for real property, the contract becomes merged into the deed and no cause of action upon said prior agreement exists. The purchaser is limited to the express covenants of the deed only." (Internal quotations and citations omitted.) *Brostek v. O'Connell*, 9th Dist. Lorain No. 10CA009779, 2010-Ohio-4544, ¶ 10. This Court has previously categorized it as an affirmative defense. *See Zanko v. Kapcar*, 9th Dist. Summit No. 20825, 2002-Ohio-2329, ¶ 3, fn.1. Accordingly the Defendants bore the burden of establishing the elements of their affirmative defense. *Glenmoore Builders, Inc. v. Smith Family Trust*, 9th Dist. Summit No. 24299, 2009-Ohio-3174, ¶ 40. Notably, the Defendants have not pointed to any place in the record where they elicited evidence that the Herholds accepted the deed without

qualification; in fact, they have not even pointed to the deed itself. *See* App.R. 16(A)(7). Instead, they have merely stated in a conclusory fashion that "[t]he Herholds accepted the deed to the property * * * without qualification pursuant to the purchase agreement for the real property."

**{¶43}** Additionally, we note "[t]here are * * * two exceptions to the doctrine of merger. The doctrine will not apply if elements of fraud or mistake exist, or if the prior agreement is collateral to and independent of the main purpose of the transaction." *Zilka v. Cent. S. Ltd.*, 9th Dist. Lorain No. 99CA007482, 2000 WL 988765, *6 (July 19, 2000). Given, the extremely limited argument made by the Defendants on this issue, and that the jury found for the Herholds on their fraud claim, a finding that is affirmed below, we cannot say that the Defendants have demonstrated an entitlement to judgment on the breach of contract claim based upon the doctrine of merger by deed. *See Hiland v. B.M. Invests.*, 2d Dist. Miami No. 93 CA 3, 1993 WL 462410, *3-4 (Nov. 9, 1993).

**{¶44}** Finally, the Defendants argue that Mr. Smith was not a party to the contract and the Herholds failed to present evidence to pierce the corporate veil. Thus, the Defendants assert that Mr. Smith could not be held individually liable.

**{¶45}** Because we conclude that, when viewing the evidence in a light most favorable to the Herholds, it would be possible for a trier of fact to conclude the Mr. Smith signed the contract in his individual capacity, we see no reason to examine whether there was sufficient evidence concerning piercing the corporate veil.

**{¶46}** "Generally, a party signing a contract as a corporate officer is not individually liable." *Spicer v. James*, 21 Ohio App.3d 222, 223 (2d Dist.1985); *see also Marhofer v. Baur*, 101 Ohio App.3d 194, 196 (9th Dist.1995) ("An officer of a corporation is not personally liable on contracts * * * for which his corporate principal is liable, unless he intentionally or

inadvertently binds himself as an individual.") (Internal quotations and citations omitted.). "However, if a corporate officer executes an agreement in a way that indicates personal liability, then that officer is personally liable regardless of his intention. Whether a corporate officer is personally liable upon a contract depends upon the form of the promise and the form of the signature." (Internal citation omitted.) *Spicer* at 223. Generally, a corporate officer is individually liable on a breach of contract claim when he or she personally signs a contract in his or her individual capacity. *Ayad v. Radio One, Inc.*, 8th Dist. Cuyahoga No. 88031, 2007-Ohio-2493, ¶ 56, citing *Spicer* at 223; *see also Big H, Inc. v. Watson*, 1st Dist. Hamilton No. C-050424, 2006-Ohio-4031, ¶ 7. ("It is undisputed law that when an agent signs a contract as an individual without adding the name of the principal, the agent is personally bound by the contract. Similarly, a corporate officer is responsible for clearly identifying the corporation for which the officer is signing, or the officer is exposed to individual liability.").

{¶47} Here, the contract at issue was composed of three pages, each with their own signature page. The first page was entitled "Real Estate Purchase Agreement[.]" That page is signed by Mr. Smith and his signature is followed by "Pres" and underneath that appears "Smith Land Co, Inc." The second page is a page of disclosures that lists the seller as "Smith Land" and appears to only be signed by Mr. Smith in his individual capacity. The third page is the addendum to the sales contract and also appears to only be signed by Mr. Smith in his individual capacity.

{¶48} Thus, there is ambiguity as to whether the entire sales agreement was signed by Mr. Smith in only his capacity as an officer of Smith Land or whether he was signing as an individual. We note again that Mr. Smith did not take the stand to clarify the ambiguity in the contract.

{¶49} Under these circumstances, we conclude that, when the evidence is viewed in a light most favorable to the Herholds, a reasonable trier of fact could find Mr. Smith individually liable under the contract. And because of that, it is not necessary to examine whether there was evidence supporting piercing the corporate veil. *See Marhofer,* 101 Ohio App.3d at 198 ("In the absence of facts that justify piercing the corporate veil, an officer is not personally liable on a contract that he has only signed in his corporate capacity.").

{¶50} In light of the foregoing, the Defendants' fourth assignment of error is overruled.

### ASSIGNMENT OF ERROR V

THE TRIAL COURT ERRED AS A MATTER OF LAW IN DENYING SMITH LAND COMPANY'S AND ROBERT SMITH'S MOTION FOR DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT PURSUANT TO CIV.[R.] 58 ON THE FRAUD/FRAUDULENT CONCEALMENT CLAIM.

{¶51} The Defendants argue in their fifth assignment of error that the trial court erred in denying their motion for directed verdict and judgment notwithstanding the verdict on the Herholds' fraud claim.

{¶52} The Herholds argued that the Defendants committed fraud by failing to disclose the unauthorized fill on the Property and by misrepresenting that the Property was buildable.

{¶53} The elements of a fraud claim are as follows:

1) a representation, or in a situation where there was a duty to disclose, a concealment of fact; 2) which fact is material to the transaction; 3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; 4) with the intent of misleading another into relying upon it; 5) justifiable reliance on the misrepresentation; and 6) a resulting injury proximately caused by the reliance.

(Citation omitted.) *Petroskey v. Martin*, 9th Dist. Lorain No. 17CA011098, 2018-Ohio-445, ¶ 17.

{¶54} Given all of the evidence discussed in detail above, and the arguments made on appeal, we conclude that sufficient evidence was presented to overcome the motion for directed verdict and judgment notwithstanding the verdict. As mentioned previously, there was a provision at the top of the Real Estate Purchase Agreement that the Herholds insisted be included because they wanted assurances that the Property was buildable. The Herholds understood the provision to mean that the Defendants were assuring the Herholds that the Property was buildable with the fill dirt that was on it at the time of the sale. Mr. Smith was aware of the Herholds' concern and agreed to add the provision to the top of the agreement. While Mr. Smith disclosed that the Property contained wetlands and that there was fill dirt on the Property, he never told the Herholds that any of the fill dirt was unauthorized. Evidence was presented that the City of Fairlawn would only issue approval for a building permit after permission from Ohio EPA was granted. A letter from Ohio EPA to Mr. Herhold was discussed at trial and indicates that the wetlands were filled by Smith Land over the allowable limits. To remedy the condition, the Herholds opted to remove the excess fill.

{¶55} The Defendants argue on appeal that they were entitled to a directed verdict and/or judgment notwithstanding the verdict on the fraud claim because the Defendants owed no duty, separate from the contract, to the Herholds. They also assert that a party cannot predicate fraud upon future performance. The Defendants have failed to demonstrate that they made either of these arguments in their motion for directed verdict or motion for judgment notwithstanding the verdict, nor can this Court locate a place in those motions where those arguments were made. *See* App.R. 16(A)(7). "This Court has held on multiple occasions that [a]rguments that were not raised in the trial court cannot be raised for the first time on appeal." (Internal quotations and

citation omitted.) *Huntington Natl. Bank v. Anderson*, 9th Dist. Lorain No. 17CA011223, 2018-Ohio-3936, ¶ 20.

{¶56} The Defendants additionally raise several other issues in a disjointed argument that it is somewhat difficult to follow. They point to *Wilfong v. Petrone*, 9th Dist. Summit No. 26317, 2013-Ohio-2434, ¶ 11, for its discussion of patent versus latent defects. However, they then assert that there was no defect at all at the time of sale, despite the evidence to the contrary discussed above. While the Defendants might disagree with the weight of that evidence, in reviewing a ruling on a motion for directed verdict or judgment notwithstanding the verdict, we must view the evidence in a light most favorable to the Herholds. *See Jackovic*, 2013-Ohio-2520, at ¶ 15.

{¶57} In that same paragraph, the Defendants also argue that the Herholds should have inspected the Property but fail to provide any discussion explaining why that should defeat the fraud claim under the circumstances before us. *See* App.R. 16(A)(7).

{¶58} Moreover, the Defendants argue that the Herholds failed to establish that the Defendants knew there was unauthorized fill on the lot or that the Property was not buildable as sold. The record discloses that the original plat map for the subdivision included a restriction that "[t]he lands delineated on this plat as wetlands are jurisdictional waters of the United States under the Federal Clean Water Act and in order to fill any of the delineated wetlands, not shown on this plat as to be filled, a permit must be obtained from the U.S. Army Corps of Engineers." The map indicated that block A, a portion of which would become the Property, contained jurisdictional wetlands that were not to be filled. There was testimony that that restriction ran with the land and would be enforced by the City of Fairlawn until the restriction was removed. There was also testimony that no one ever sought to have the restriction removed. When block

A was split, the plat map also contained the same language in the aforementioned restriction in a note on the map. Smith Land did apply to the United States Army Corps of Engineers to fill a portion of the jurisdictional wetland, which included portions of block A, including a portion of the Property. That application was approved. Thus, it would be reasonable to presume that the Defendants had knowledge of where and how much fill they were authorized to place on the Property.

{¶59} There was testimony that, prior to the sale of the Property, Mr. Smith told Mr. Herhold that there was some fill dirt on the Property that he had brought in and that "he was allowed to bring fill dirt in there." There was also evidence that Ohio EPA concluded that the fill on the Property failed to comply with the permit from the United States Army Corps of Engineers in that there was excessive fill dirt on the Property at the north property boundary that was placed there by Smith Land. There was no evidence that anyone aside from the Defendants placed fill on the Property. Mr. Wilk described the fill on the Property as surpassing the allowable amount by a "great margin." Mr. Wilk testified that he went out and viewed the Property, and, using the map that delineated where the fill could be placed, he stated "it was obvious" that the fill continued outside the prescribed boundaries. In fact, Mr. Herhold testified that he had to remove about 40 dump trucks full of fill from the Property. From that evidence, a trier of fact could conclude that the Defendants had knowledge of the excess fill dirt and because of that could also conclude that Defendants knew the Property was not buildable as sold.

{¶60} Finally, the Defendants argue that they could never have known that Ohio EPA was going to enforce a law that did not exist at the time the Property sold. The Defendants appear to be referring to testimony by Mr. Wilk about R.C. 6111.03, which Mr. Wilk cited in his testimony. That statute discusses the numerous water pollution control powers of the director of

environmental protection. *See* R.C. 6111.03. Mr. Wilk testified that that statue went into effect in 1982 while the Defendants claim that it did not go into effect until 2003, after the sale. This Court's review of the history of the statute reveals that the statute dates back to even before 1982. Accordingly, the Defendants' argument is without merit.

{¶61} Given the arguments raised on appeal, the Defendants' fifth assignment of error is overruled.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED WHEN IT FAILED TO FIND AS A MATTER OF LAW THAT THE USACE PERMIT ISSUED TO SMITH LAND COMPANY[] WAS NOT VIOLATED AND THAT THE U.S. SUPREME COURT DECISION IN *SOLID WASTE AGENCY OF NORTHERN COOK COUNTY V. ARMY CORPS[.] OF ENGINEERS*, 531 U.S. 159 (2001) WAS THE SUPREME LAW OF THE LAND AS OF THE DATE OF THAT DECISION.

{¶62} The Defendants argue in their first assignment of error that the trial court erred in failing to find as a matter of law that the United States Army Corps of Engineers permit was not violated and that the decision in *Solid Waste Agency of N. Cook Cty. v. Army Corps of Engineers*, 531 U.S. 159 (2001), was the supreme law of the land. While the Defendants spend a great deal of time discussing the aforementioned case, what they believe its implications are for this matter, and the general import of a United States Supreme Court decision, they fail to identify where in the record they asked the trial court to make such a ruling or where in the record the trial court failed to make the ruling they now challenge. *See* Loc.R. 7(F) ("If a party fails to include a reference to a part of the record that is necessary to the court's review, the court may disregard the assignment of error or argument."); App.R. 16(A)(7). Accordingly, this Court is not even certain which ruling of the trial court this assignment of error is challenging. While the Defendants, in a footnote, reference a page in the transcript from the first trial, they have not

explained why a statement from the trial court from the first trial should be reviewed in deciding an appeal from the second trial. *See* App.R. 16(A)(7).

**{¶63}** Given the foregoing, the Defendants' first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN ALLOWING ED WILK, OHIO EPA, TO TESTIFY, TO ASSERT ENFORCEMENT AUTHORITY OVER THE USACE PERMIT, AND TO ASSERT AN UNCONSTITUTIONAL RETROACTIVE ENFORCEMENT OF R.[C.] 6111.03.

**{¶64}** The Defendants argue in their second assignment of error that the trial court erred in allowing Mr. Wilk to testify. They note that they objected to his testimony at trial based upon relevancy. However, in their brief, the Defendants have not developed an argument articulating why Mr. Wilk's testimony was not relevant. *See* App.R. 16(A)(7). The Defendants fail to cite to the pertinent evidentiary rule and also fail to explain how the evidence they reference was irrelevant. In addition, the Defendants assert that Mr. Wilk's testimony misled the jury as he testified to an inaccurate effective date of R.C. 6111.03, thereby evidencing a retroactive enforcement of R.C. 6111.03. This argument has already been addressed. Further, they allege that Mr. Wilk never provided them notice of an enforcement action under R.C. 6111.03 and thereby his testimony also demonstrated a violation of their due process rights. We note that the Defendants have not pointed to a place in the record where they objected to the testimony based upon these issues or concerns. *See* Loc.R. 7(F). Nor have the Defendants explained how these issues would relate to the relevancy of Mr. Wilk's testimony. *See* App.R. 16(A)(7). Thus, we cannot conclude that the Defendants met their burden to demonstrate error with respect to this assignment of error. *See Wiegand v. Fabrizi Trucking & Paving Co.,* 9th Dist. Medina No. 16CA0015-M, 2017-Ohio-363, ¶ 35 ("The Wiegands spend most of their argument detailing

why they believe that the witnesses were incorrect instead of explaining why their testimony was inadmissible.").

{¶65} In light of the foregoing, we overrule the Defendants' second assignment of error.

### ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANTS['] REQUEST TO REOPEN DISCOVERY FOR THE PURPOSE OF DEPOSING ED WILK.

{¶66} The Defendants argue in their third assignment of error that the trial court erred when it denied their request to reopen discovery to depose Mr. Wilk and subpoena him to bring the entire contents of his file for the Property.

{¶67} "A trial court has the inherent authority to control its docket and to decide discovery matters." *In re Estate of Durkin*, 9th Dist. Summit No. 28861, 2018-Ohio-2283, ¶ 17. Accordingly, "[t]his Court will not reverse a trial court's decision concerning the regulation of its discovery proceedings absent an abuse of discretion." *Roberts v. Roberts*, 9th Dist. Summit No. 28509, 2017-Ohio-8473, ¶ 10.

{¶68} In the motion to reopen discovery, which was made subsequent to the first trial, the Defendants claimed that Mr. Wilk failed to comply with the Herholds' subpoena in the first trial as he did not bring all relevant documents to trial. However, the Defendants also pointed out in their motion that they later made a public records request for the file and received an electronic copy of the file from Ohio EPA. They maintained that some of the newly obtained documents contradicted Mr. Wilk's testimony at the first trial and, because he failed to bring those documents to the first trial, they were unable to cross-examine him about them.

{¶69} In ruling on the motion, the trial court noted that the Defendants did not issue the subpoena they assert was not followed and that the Defendants now had the documents. Further,

the trial court observed that the Defendants would have the ability to subpoena Mr. Wilk to appear at the trial or would be able to cross-examine him at trial if the Herholds subpoenaed him.

{¶70} We cannot say that the Defendants have demonstrated that the trial court abused its discretion in denying the motion to reopen discovery. The trial court's ruling is not unreasonable, arbitrary, or unconscionable. *See Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219 (1983). We note that the complaint was filed in 2008 and the first trial did not begin until 2014. Thus, it appears that the parties had ample time to conduct discovery. The record reflects that a notice of deposition was filed even as late as November 2013. Moreover, the Defendants had Mr. Wilk's file prior to the second trial and thus had the ability to cross-examine him about the issues they raised in their motion. The Defendants have not asserted that they were prevented from cross-examining Mr. Wilk about any issue they raised in their motion.

{¶71} The Defendants' third assignment of error is overruled.

### ASSIGNMENT OF ERROR VI

THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT AWARDED PUNITIVE DAMAGES.

{¶72} The Defendants assert in their sixth assignment of error that the trial court erred when it awarded punitive damages.

{¶73} In a conclusory fashion, the Defendants assert there was "no showing of fraud, let alone 'malice or aggravated or egregious fraud' as required by R.C. []2315.21(C)(1)." However, they have not otherwise developed an argument on this issue. It is the Defendants' burden on appeal to demonstrate error. *See In re Estate of Durkin*, 2018-Ohio-2283, at ¶ 9 ("It is an appellant's duty to demonstrate his assigned error through an argument that is supported by citations to legal authority and facts in the record; it is not the function of this Court to construct a foundation for his claims.").

**{¶74}** Additionally, the Defendants assert that the punitive damages award of $165,000 was far in excess of two times the fraud award, which was $5,300, and that such an award is prohibited by R.C. 2315.21(D)(2)(a).

**{¶75}** R.C. 2315.21(D)(2)(a) provides that "[t]he court shall not enter judgment for punitive or exemplary damages in excess of two times the amount of the compensatory damages awarded to the plaintiff from that defendant, as determined pursuant to division (B)(2) or (3) of this section." However, this punitive damages cap only became effective April 7, 2005. *Northpoint Props. v. Charter One Bank*, 8th Dist. Cuyahoga No. 100210, 2014-Ohio-1430, ¶ 74. Courts have generally appeared to be unwilling to apply R.C. 2315.21 retroactively. *See id.* "Thus, a court cannot apply it to causes of action that arose before the statute's effective date even if some of the conduct giving rise to the cause of action occurred after the effective date." *Blair v. McDonagh*, 177 Ohio App.3d 262, 2008-Ohio-3698, (1st Dist.) ¶ 67.

**{¶76}** Here the sale of the Property took place in 2002, and thus the representations as to buildability and fill dirt were made at that time as well. However, it was not until as late as early 2005 that the Herholds discovered that the City of Fairlawn would not issue a prospective buyer a building permit for the Property. In fact, the prospective buyer received a letter from Mr. Randles dated April 1, 2005, explaining that construction would impact the wetlands and that the prospective buyer would need to receive permission from Ohio EPA for such activity. Given the foregoing, there appears to be evidence that almost all of the conduct at issue occurred prior to the effective date of the statute. Prior to the effective date of the current version of R.C. 2315.21(D)(2)(a), there was no cap on punitive damages. *See id.* at ¶ 69. Accordingly, the Defendants have not demonstrated that the trial court erred in failing to apply the punitive damages cap in the statute.

{¶77} The Defendants' sixth assignment of error is overruled.

## ASSIGNMENT OF ERROR VII

THE TRIAL COURT ERRED WHEN IT DENIED SMITH LAND COMPANY AND ROBERT SMITH A NEW TRIAL PURSUANT TO CIV.[R.] 59.

{¶78} The Defendants argue in their seventh assignment of error that the trial court erred in denying their motion for new trial pursuant to Civ.R. 59. In their motion for new trial, the Defendants relied upon Civ.R. 59(A)(1) and (A)(8).

{¶79} "Depending upon the basis of the motion for a new trial, this Court will review a trial court's decision to grant or deny the motion under either a de novo or an abuse of discretion standard of review." (Internal quotations and citations omitted.) *Marquez v. Jackson*, 9th Dist. Lorain No. 16CA011049, 2018-Ohio-346, ¶ 11. "If the stated grounds for a new trial involve[] a question of law, the de novo standard of review applies. If the basis for a new trial involves the determination of an issue left to the trial court's discretion, the abuse of discretion standard applies." (Internal quotations and citations omitted.) *Id.*

{¶80} Civ.R. 59(A) provides in relevant part:

A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:

(1) Irregularity in the proceedings of the court, jury, magistrate, or prevailing party, or any order of the court or magistrate, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial;

* * *

(8) Newly discovered evidence, material for the party applying, which with reasonable diligence he could not have discovered and produced at trial[.]

## Civ.R. 59(A)(1)

{¶81} The Defendants make several arguments as to why they are entitled to relief under Civ.R. 59(A)(1).

{¶82} First, they assert that the Herholds and Herholds' counsel were repeatedly allowed to refer to the fill dirt as excessive and/or illegal. While the Defendants mention the use of the phrase "excessive" fill, the focus of their argument is on the use of the word "illegal," because of the connotations that accompany that word. However, the Defendants have not pointed to anywhere in the transcript where the phrase "illegal" fill was actually used by the Herholds or the Herholds' counsel. *See* App.R. 16(A)(7). In their brief, the Defendants have pointed to places in the transcript where the words excess, excessive, and unauthorized fill appear, but not to anywhere the word illegal is used in terms of fill dirt. Thus, even assuming use of such word was improper, the Defendants have not demonstrated that the word was used.

{¶83} The Defendants also again challenge the testimony of Mr. Wilk asserting that they were never given any notice that Ohio EPA was taking administrative action against them and that they had no way to know that Ohio EPA would enforce a statute that was not enacted at the time the Property sold. This Court has addressed the issue with the statute (R.C. 6111.03) supra, and that contention has no merit. With respect to the Defendants' argument concerning notice of administrative action, the Defendants have not pointed to anywhere in the record that evidences that any action, administrative or otherwise, was actually taken by Ohio EPA against the Defendants concerning the Property. Nor have the Defendants explained why Mr. Wilk's testimony entitled them to a new trial. *See* App.R. 16(A)(7).

{¶84} Additionally, the Defendants point to several objections they raised during the trial and comments made by the trial court in response. The Defendants challenge a portion of the following comments made by the trial court after it overruled an objection by the Defendants. The trial court stated:

> [T]he record should reflect that the defendant has a continuing objection to all references to mortgages. Ladies and gentlemen, at the end of the trial, I'm going

to instruct you on how you would compute damages if you've found liability against the defendant, because the defendants are liable. So my instruction to you would be that when you look at those jury instructions, those jury instructions will tell you – guide you through deliberations.

It may very well be that there could be a situation where you find as a juror where the plaintiff believes certain items of damage were proved, but you find they are not part of the damages. Do you understand what I'm saying? What I'm trying to say is, is that the fact that I'm allowing this evidence does not mean that you have to make a finding that way, because you would base your finding on the instructions. You got me on that?

**{¶85}** The trial court then asked whether that explanation was satisfactory to the parties and both sides responded affirmatively. In light of the Defendants' acquiescence, they have not demonstrated the trial court erred in denying their motion for new trial on that basis.

**{¶86}** Defendants also point to a comment by the trial court made while sustaining one of the Defendants' objections. The trial court told the jury to disregard the last comment as the trial court found it irrelevant. The trial court then said "[i]t is not part of the damages [the Herholds] [are] going to recover." While such a statement could be viewed as improperly opining that the Herholds would recover damages, the Defendants did not object to the comment by the trial court or move to have it stricken. Thus, as above, the Defendants have not demonstrated that the comment warranted a new trial.

**{¶87}** The Defendants also challenge the trial court allowing leading questions, allowing Mr. Wilk to illustrate the fill on a document he was not familiar with, and in disallowing a jury view of the Property. However, the Defendants have not explained how these comments prejudiced them in such a way as to warrant a new trial. *See* App.R. 16(A)(7). We note that a trial court has discretion to allow leading questions under certain circumstances, *see State v. Liddle*, 9th Dist. Summit No. 23287, 2007-Ohio-1820, ¶ 30, citing Evid.R. 611(C), and also has

discretion in determining whether to grant a jury view. *See Barker v. Geotech Servs.*, 9th Dist. Summit No. 22742, 2006-Ohio-3814, ¶ 4.

**{¶88}** Given the foregoing, we cannot say that the trial court erred in denying the Defendants' motion for new trial pursuant to Civ.R. 59(A)(1).

### Civ.R. 59(A)(8)

**{¶89}** As noted above, Civ.R. 59(A)(8) deals with a motion for new trial based upon "[n]ewly discovered evidence, material for the party applying, which with reasonable diligence he could not have discovered and produced at trial[.]" Civ.R. 59(A)(8).

**{¶90}** The Defendants argued below and on appeal that, subsequent to the trial, they discovered evidence that the fill dirt from the Property was not properly removed as claimed by Mr. Wilk. Mr. Smith had a conversation with an engineer, who indicated that there might be historical photos of the Property available. The Defendants claimed that the historical photos that were found were from April 9, 2005 (before the fill dirt was removed) and February 28, 2006 (after the fill dirt was removed). The Defendants argue that the photos demonstrate that the fill dirt was not removed from the Property and, instead, was spread on the Property and an adjoining lot. The Defendants' motion was accompanied by an affidavit by Mr. Smith, an affidavit by the engineer, and photos.

**{¶91}** "[B]efore a new trial may be granted on the basis of newly discovered evidence, the evidence (1) must be such as will probably change the result if a new trial is granted, (2) must have been discovered since the trial, (3) must be such as could not in the exercise of due diligence have been discovered before the trial, (4) must be material to the issues, (5) must not be merely cumulative to former evidence, and (6) must not merely impeach or contradict the former evidence." (Internal quotations and citations omitted.) *Cooper v. Nadeau,* 9th Dist. Wayne No.

09CA0032, 2010-Ohio-2150, ¶ 14. Even assuming the Defendants satisfied the other elements, the Defendants have not explained why this newly discovered evidence could not have been discovered before trial, particularly given the age of the photos that they claim are newly discovered.

**{¶92}** Thus, we cannot say that the trial court erred in denying the Defendants' motion for a new trial based upon newly discovered evidence.

**{¶93}** Defendants' seventh assignment of error is overruled.

### III.

**{¶94}** The Defendants' assignments of error are overruled. The outstanding motion to take judicial notice of a filing in a separate proceeding is denied. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants.

                                        _____
                                        DONNA J. CARR
                                        FOR THE COURT

SCHAFER, P. J.
TEODOSIO, J.
CONCUR.


APPEARANCES:

WARNER MENDENHALL, Attorney at Law, for Appellants.

THOMAS A. SKIDMORE, Attorney at Law, for Appellees.